The opinion of the court was delivered by
Poché, J.
This is an action in damages by the father and the mother of one Blizé Brown, for the death of the latter, which resulted from a collision between a passenger train of the defendant company .and a plantation cart driven by the deceased.
The defence is a general denial, and the plea of contributory negligence.
The railroad company appeals from a judgment of 810,000, based •on the verdict of a jury.
The accident occurred on the 6th of March, 1889, at about 2 o’clock p. m. , on a large sugar plantation situated on the Mississippi river, extending to the rear between lateral lines, and which is crossed from one of said lines to the other by the road bed.
There are on the plantation several roads, extending from the front to the rear thereof, which cross the railroad, and which are elevated at each intersection to a height sufficient to reach the level of the road bed, so as to facilitate the passage over the same.
On that day the deceased, Blizé Brown, who was a laborer on that plantation, was engaged in hauling seed cane from the front to the rear of the field, and in that work he ha I to use one of the roads which intersected the track as hereinabove stated. The cart which he drove was hitched to four mules, two leading together, .and two together as wheel mules, one of the latter being ridden by the driver.
*352 As a special passenger train, running from New Orleans west, at the rate of thirty miles an hour, approached that plantation, Brown, the deceased, was driving his empty cart from the rear or swamp side of the railroad to the front or river side of the plantation, and, as his team was in the act of j crossing the track, the collision occurred, by which three of the mules were killed outright, and by which he received the injuries which caused his death some fifty hours later. Plaintiffs’ theory of the case is that the accident is attributable exclusively to the fault of the company and of its employés, and that the deceased is entirely free of any charge of' negligence or want of proper care in the premises.
Their contention is that it was gross negligence on the part of the engineer to have failed to blow his whistle at one-quarter of a mile before reaching the crossing, as he was required by the rules of the company, and for failing to give any other warning of the approach of his train, which was an extra train, running and passing at that point at an unusual hour, at which time no trains of any description, or in any direction, were due according to schedule.
They further contend that for these same reasons the deceased, whose work necessitated his frequent crossing of the railroad track, and who knew no train was to be expected from New Orleans before late evening, and that the first train due on that day was to come from an opposite direction, on its way to New Orleans, and would be due only at 3:30 in the evening, was not held to a greater degree of care and caution than that which he had exercised on the occasion.
On many of the questions of fact involved in that contention the evidence is very conflicting.
But the preponderance of the testimony in the record is to the effect that as Brown approached the railroad track he was driving his team at a slow trot, but as he began to ascend the elevation leading to the crossing, his mules moved at a walk, which was their gait when struck by the engine.
He was looking straight ahead, and he did not see the train or hear’ its noise.
"When he was at a short distance from the track he was seen by the fireman, who had just then taken his seat on the same side of the engine as that on which the team was moving, having a moment before been engaged in putting coal in the furnace.
*353 As soon as he saw Brown he began to ring his bell, and observing that the latter was still approaching the track, he sang out to the engineer that a team was approaching, but Brown was then only about ten feet from the track.
The engineer, who sat on the opposite side of the engine, the regular place of that employ^, did not, and says that he could not, see Brown on account of the intervening boilers, and he saw only the two lead mules, and that only at the moment of the collision. On the warning of the fireman, the engineer at once sounded his whistle, .applied the air brakes, and reversed his engine. But it was too late, and the collision occurred.
It is admitted by the engineer in his testimony that he did not •sound his whistle one-quarter of a mile before preaching the crossing at which Brown was struck, and that his only alarm whistle was ¡sounded at about half a mile distant from that point, and that it was really the whistle for a platform on the adjoining plantation.
That testimony therefore goes a great way to fasten proof of negligence on the engineer, who is thus shown to have neglected or failed to comply with the rule of the company itself, by which he was required to have sounded his whistle at a quarter of a mile before reaching the crossing at which the accident occurred.
But the question is yet open as to the contributory negligence ■charged to the deceased.
It is in proof that the road bed was elevated about four feet above the level of the surrounding fields, that at that season of the year there were no plants growing or grown, no weeds or undergrowth of any kind, or other obstacle to'obstruct the view of the road, which laid high and clear, open to uninterrupted view for at least half a mile either way from the crossing. The whole scene was in a large, open field in full cultivation, without the slightest obstacle to noise or sound, and it was on a clear day, with sunshine, at about 2 o’clock p. m., that the accident occurred.
It is therefore clear and unquestionable that the deceased was in no way deprived of every facility to see the approaching train, or to hear the loud noise made by it in its rapid motion at the rate of thirty miles per hour.
But it is in proof, and it is not denied by plaintiffs, that as he approached the road, and before attempting to cross it, Brown looked right straight ahead, without turning his eyes either way, although *354 his mules slackened their gait as soon as they reached the elevation hereinabove described, which was at least a reminder of the proximate crossing.
It is no answer to this suggestion to say that the train was a special train, running at an unusual and an unexpected hour. It is in proof that special or extra trains were not of unfrequent occurrence on that road. And common prudence would dictate to any ordinary man that a train might be expected at any time on a railroad of vast extent in full and active operation, especially at its busy season, as was the case here.
The relative duties of persons in charge of trains on railroads, and of travelers who have occasion to cross such railroads, are well defined in jurisprudence and are thoroughly understood in all American courts.
And we commend our learned brother of the District Court for having adopted and embodied in his charge to the jury the following simple and clear exposition of those rights and duties, made by the Supreme Court of the United States in the [case of Improvement Company vs. Stead, 95 U. S. 161:
“ If a railroad crosses a common road on the same level, those traveling on either have a legal right to pass over the point of crossing, and to require due care on the part of those traveling on the other, to avoid a collision. Of course, these mutual rights have respect to other relative rights subsisting between the parties. From the character and momentum of a railroad train, and the requirements of public travel by means thereof, it can not be expected that it shall stop and give precedence to an approaching wagon to make the crossing first; it is the duty[[of the wagon to wait for the train. The train has the preference and right of way. But it is bound to give due warning of its approach, so that the wagon may stop and allow it to pass, and to use every exertion to stop if the wagon is inevitably in the way.” * * *
“ On the other hand, those who are crossing a railroad track are bound to exercise ordinary care and due diligence to ascertain whether a train is approaching. They have, indeed, the greatest incentives to caution, for their lives are in imminent danger if collision happen, and hence it will not be presumed, without evidence, that they do not exercise proper care in a particular case. But notwithstanding the hazard, the infirmity of the human mind in ordi *355 nary men is such that they often do manifest a degree of negligence and temerity entirely inconsistent with the care and prudence which is required of them, such, namely, [as an ordinary prudent man would exercise under the circumstances. When such is the ease,. they can not obtain reparation, even though the railroad company be in fault. They are the authors of their own misfortune.”
In another case the same [exalted tribunal announced practically the same principle in the following language, as condensed in the syllabus of the case of Railroad Company vs Houston, 95 U. S. 697:
“ The neglect of an engineer of a railroad train to sound its whistle ór ring its bell on nearing a street crossing does not relieve a traveler on the street from the necessity of taking ordinary precautions for his safety. Before attempting to cross the railroad track, he is bound to use hjs senses — to listen and to look — in order to avoid any possible accident from an approaching train.”
In his work on contributory negligence, Beach, culling the same rule from “a multitude of decisions” formulates the doctrine thus:
“When one approaches a point upon the highway, where a railroad track is crossed upon the same level, it is his plain duty to proceed with caution, and if he attempts to cross the track, either on foot or in a vehicle of any description, he must exercise, in so doing, what the law regards as ordinary care Under the circumstances. He must assume that there is danger, and act with ordinary prudence and circumspection upon that assumption.” Sec. 63, page 191.
“In attempting to cross, the traveler must listen for signals, notice signs put up as warnings, and look attentively up and down the track.”
“Statutes and municipal ordinances in every jurisdiction prescribe specifically the duty of railway corporations in respect to railway crossings; but no failure on the part of the railroad company to do its duty will excuse any one from using the senses of sight and hearing, upon approaching a railway crossing, and whenever the due use of either Sense would have enabled the injured person to escape the danger, the injury is conclusive evidence of negligence, without any reference to the railroad’s failure to perform its duty.” See. 64, page 195.
See also Wood’s Railway Law, 1312; 75 N. Y. 281; Salter vs. R. R. Co.; Murray vs. Railway Co., 31 An. 492; Childs vs. R. R. Co., 33 *356 An. 154; Houston vs. V. S. & P. R. R., 39 An. 796; Weeks vs. R. R. Co., 40 An. 800.
As applied to the case in hand this reasonable rule required that Brown, in attempting to cross the railroad track, should have looked up and down the track; by so doing he would inevitably have seen the train which was in full view for nearly a mile, without the slightest obstruction. And that obligation is not affected by the fact that the train was a special or extra train; that circumstance may have mitigated the degree of his negligence, but it could not screen his conduct from the imputation of some negligence. Had he listened as he approached the crossing he would certainly have heard the train -as it thundered along in the open field at the rate of thirty miles an hour with no obstruction to sound, and making a noise, which one of the witnesses compares to that made by “a drove of cattle going across a bridge.”
It is in proof that one of plaintiffs’ witnesses who was half a mile ■off, that another who was at a distance 'of one hundred yards, a third who was three hundred yards off, and a fourth who was at a distance of several hundred yards, and who was walking toward Brown, on the same road and on the opposite side of the track, all saw and heard the train before the accident; and that the attention of one of them was attracted to the train by the noise which it made.
There is no pretence that Brown was defective in hearing, or near sighted, and it is passing strange that he should have neither seen or ■heard the approaching train. Plaintiffs’ counsel suggests that his mind was absorbed in thoughts about his work. This is very probably the case, and it turns out to have been his misfortune and the loss of his parents, but it is legal negligence which clearly ■contributed to the deplorable accident which cost him his life, and which is a bar to plaintiff’s right of recovery in this case.
It was negligence on the part of the engineer to have omitted to sound the whistle at a quarter of a mile before that crossing; but that omission did not render the accident inevitable if, on the other hand, Brown had been sufficiently prudent and careful when he approached the crossing.
It is in proof that his mules came from a slow trot to a walk at about twenty feet from the track. Had he seen or heard the train it was yet time, and it would have been easy for him to have stopped his team and thus have ■ avoided the accident.
*357 When the train hands first saw him they used every means in their power to avoid the collision, bnt it was no easy matter to stop a train moving at the rate of thirty miles an hour, and there was no obligation on the part of the company to slacken the speed of its trains at the numerous plantation cross roads intersected by its track. When the fireman first saw Brown he rang the bell, and he naturally supposed that the team would be stopped before reaching the crossing; but as the team kept on approaching, the engineer, who could not see Brown from his place, was then warned, and he applied the brakes and reversed his engine, but it was too late. At that point nothing more could have been exacted of them. We therefore conclude that Brown’s negligence, or want of care, contributed to the accident, and that therefore his parents can not recover-in the present action.
It is therefore ordered, adjudged and decreed that the judgment appealed from be annulled, avoided and reversed; that the verdict of the jury be set aside, and that plaintiff’s demand be rejected and their action dismissed at their costs in both courts.