PROVO STY, J.
The plaintiffs sue the defendant railway company for the death of their two little boys, one 6 and the other l(j years old, who were killed upon the Cemetery street crossing of the defendant’s railway in the town of Minden by being run over by one of the locomotives of the defendant company. Cemetery street is 40 feet wide, and crosses the yard of the defendant company. It runs east and west, and the tracks upon the yard run north and south. There are four of them • — three side tracks and one main track. The two lads at about 2 o’clock in the day were going west upon Cemetery street in a one-mule wagon driven by their grandfather, Mr. Johnson. They were seated on the floor of the wagon at the tail end, facing back,, with their feet dangling, while their grandfather and his 12-year old son were seated upon the spring seat in front. As Johnson approached the tracks, there was to his right, or north, and flush with the first track, and 20 feet from the crossing, a large warehouse-obstructing his view in that direction, that is to say, in the direction from which the locomotive was coming. At the north end of this-warehouse, about 500 feet" from the crossing,, was a planer mill, making the usual noises of such an establishment. When Johnson "reached the first track, he stopped, looked, and listened. As he thus stood, with the head of his mule pointing west and within a few feet of the first track, there were cars obstructing his view on both sides of the crossing. On his right, or north, side there were the following: On the first track, some cars,, 30 or 90 feet from the crossing; on the second track, some flat cars loaded with logs, beginning about 20 or 30 feet from the crossing; on the third track, that next to the main track, a long train of cars loaded with logs, beginning some 5 feet upon the crossing and extending a long distance north. The testimony conflicts as to the number of cars on the-left of Johnson, or south of the crossing. According to Lee Griffin, whose testimony we- *474 have adopted in the matter of the number and location of these cars, there was but one •car below the crossing, and it stood 20. or 30 feet or more from the crossing. Not seeing and not hearing anything, and thinking the way safe, Johnson ventured upon the tracks. The distance from the outer rail of the first •track to the outer rail of the fourth track was 49 feet. He passed the first, second, and third tracks safely; but on the fourth track, on the other side of the long train of cars which stood upon the third track, a locomotive with tender was coming, and was so dose to the crossing, when the mule and wagon appeared from behind the cars that stood on the third track, that a collision was inevitable. The locomotive was backing. Johnson says he did not hear it, and we can well believe the statement, as he would not otherwise have cast under its wheels his own life and the other precious lives in his keeping. His not hearing is accounted for by the fact that the planer mill to his right was making some noise, but more especially by the fact that the track was downgrade and smooth, and the locomotive had shut off steam 275 yards back, and was coming almost noiselessly ; the only noise being the rumbling of the wheels.
The seriously contested facts in the case are as to the speed of the engine and as to whether the usual signals by bell and whistle were given.
The crew of the locomotive, and one witness who first saw it when within 30 feet of the crossing, say it was going at from 6 to 10 miles an hour; but, if by this is meant that it was not going faster than was usual upon the yard, the testimony stands in opposition to that of a large number of witnesses whose attention was attracted to it. These witnesses lived in the neighborhood or this yard, and were accustomed to the noises and movements upon it, and the speed of this particular engine would not likely have attracted their attention, if it had not been unusual; and the effect upon the wagon shows that the blow must have been quick and sharp. Every spoke was broken in the two hind wheels, where the wagon was struck. One witness, of more than 12 years’ experience as a locomotive engineer, says that his attention was attracted to the engine by the rapidity of itá exhaust; that it shut off steam about 275 yards from the crossing, and that he continued to observe it until it was about 75 yards of the crossing, and it was still going about 25 miles an hour. How far beyond the crossing the locomotive ran after the collision it is impossible to know definitely from the conflicting testimony.
The occupants of the wagon were hurled in the air and forward, how far is variously stated by the witnesses. Johnson was found senseless, but with no serious injury. His son was unhurt. The two other boys fell on the track and were run over. One had a hand and a foot cut off, and the other a leg; and both were otherwise wounded and severely bruised and lacerated. Both died before the next morning.
It is inconceivable that if the whistle wps blown near enough to the crossing to serve for a warning, or if the bell was rung continuously, these signals would not have been heard by Johnson and by so many persons whose attention was attracted to this engine by its unusual speed. The theory that will best reconcile the conflicting testimony on these points is that the whistle was blown too far up the track to serve as a warning, and the bell was begun to be rung too near or too late.
Defendant has an elaborate argument with diagrams to prove that the smokestack of the locomotive protruded 1% feet above the long train of log piled-up cars on the other side of which the locomotive was coming, and that Johnson could have seen it. But the best proof that Johnson could not see it is that he *476 stopped and looked and did not see it, although he had good eyes and was familiar with the crossing.
Defendant’s learned counsel argue that Johnson stopped at the wrong place to look and listen; that he should not hav.e stopped before going upon the first track, but should have waited until he had gone upon tracks 1, 2, and 3. We do not agree with that view. The four tracks were only 49 sfeet across. Johnson could see and hear just as well where he stopped as nearer to the fourth track, and had he gone upon the tracks and stopped there, and been injured, defendant would have been the first to construe his act into negligence.
We are satisfied that the true cause of the accident was the negligence of the employes of defendant in charge of the locomotive in not giving the proper warnings by bell and whistle, and in coming upon this crossing, one of the most frequented of the town, at a negligent speed, especially in view of its obstructed condition from the cars standing upon and near it. The engineer frankly admitted on the witness stand that he did not know the cars stood so near the crossing, or, in other words, that the crossing was so obstructed or so dangerous. This engineer, by the way, was a mere fireman, with very little experience in running engines, who had taken charge that very day in the absence of the regular engineer on leave. The same fireman, acting engineer, was discharged twice for negligence between the date of this accident, May, 1906, and the date of the trial, June, 1907.
By leaving these cars so near the crossing and obstructing the view, defendant increased the danger, and thereby assumed the duty of taking extra precautions for guarding against accidents. Eichorn v. N. O. & C. R. L. & Pr. Co., 112 La. 237, 36 South, 335, 104 Am. St. Rep. 437.
Defendant not only took no extra precautions, but neglected even the ordinary ones. It ran this locomotive at extra speed and noiselessly on the other side of a train of cars, thereby laying a sort of trap, and gave imperfectly, if at all, even the ordinary signals of bell and whistle.
One who, on a public highway, approaches a railroad track, and can neither hear nor see any indication of a moving train, is not chargeable with negligence in assuming that there is none sufficiently near to make the crossing dangerous. Tabor v. Mo. Valley R. R. Co., 46 Mo. 353, 2 Am. Rep. 517; Kennayde v. Pac. R. R. Co., 45 Mo. 255. See, also, Correll v. B., C. R. & M. R. R. Co., 38 Iowa, 120, Am. Rep. 22, and Pennsylvania R. Co. v. Weber, 76 Pa. 157, 18 Am. Rep. 407; Louisville, etc., R. R. Co. v. Commonwealth, 13 Bush (Ky.) 388, 26 Am. Rep. 205.
Plaintiffs claim damages as follows: Eor the great shock to them, and for their pain, sorrow, anguish, and distress, $10,000; for deprivation of comfort, society, companionship, and assistance of their boys, who were their only children, $10,000; for the pain, torture, and anguish suffered by the boys, and which they inherit from them, $15,000; punitory damages, $10,000 — total, $45,000. The jury allowed $30,000, without specification of what they made the allowance for.
This case is not one for the allowance of punitory damages. Parker v. Crowell & Spencer, 115 La. 466, 39 South. 445. Touching the proper amount of damages to allow in a case of this kind we find no occasion for adding anything to what was said in the case of Bourg v. Brownell-Drews Lumber Co. (La.) 45 South. 972.[1] in Buechner v. City, 112 La. 599, 36 South. 603, 66 L. R. A. 334, 104 Am St. Rep. 455, for the death of a child, this court allowed the parents $6,000. A like amount for each of the children will in this ease satisfy the ends of justice.
The judgment appealed from is reduced to *478 $12,000, and, as thus reduced, is affirmed. Plaintiffs to pay costs of appeal, and defendant those of lower court.

 120 La. 1009.