No. 1453.
First Circuit Appeal.

———

MRS. SALLY C. BLANCHARD, INDIVID-
UALLY AND AS TUTRIX, v. GULF,
COLORADO & SANTA FE RAIL-
WAY COMPANY.

———

(December 2, 1924, Opinion and Decree.)

———

(*Syllabus by the Editor.*)

1. **Louisiana Digest, Appeal—Par. 715.**

No provision is made in the Code of Prac-
tice to allow courts of appeal to re-
mand cases for a new trial or that
defendant be authorized to take tes-
timony in the lower court to prove cer-
tain facts alleged in the motion, but
it is the duty of all courts to accom-
plish justice.

2. **Louisiana Digest, Railroads—Par. 58,
60, 62.**

Where a train of 31 freight cars was back-
ing over a crossing without a look-
out and the crossing was wholly un-
protected by a flagman, the railroad
was guilty of gross negligence, which
caused a death in an auto collision
which resulted.

3. **Louisiana Digest, Railroads—Par. 64,
65.**

The deceased was not contributorily neg-
ligent because he did not come to a
full stop and cut off his auto engine
to listen before going on the railroad
track. He had a right to believe that
the railroad train crew would have re-
gard for the safety of the public.

(Civil Code, Art. 2315. Editor's note.)

Appeal from Parish of Allen, Hon.
Thomas F. Porter, Jr., Judge.

This is a suit to recover damages for
death of husband and father in a collision
between a train and auto. There was judg-
ment for plaintiff and defendant appealed.

Judgment affirmed.

Williams and Reid, of Oakdale, attorneys
for plaintiff, appellee.

Pujo and Bell, of Lake Charles, attorneys
for defendant, appellant.

ELLIOTT, J. Mrs. Sally C. Blanchard,
individually as widow of James M. Blanch-
ard, deceased, and as natural tutrix of
Clint and Evelyn Blanchard, her minor
children, born of her marriage with the
said deceased, brought this action in dam-
ages against the Gulf, Colorado & Santa
Fe Railway Company on account of his
death.

She substantially alleges that James M.
Blanchard, her husband, owned and op-
erated an automobile omnibus and while
attempting to make a public highway cross-
ing of said railroad in the City of Oak-
dale a little after midnight on March 11th,
1923, a backing freight train operated by
said railroad company, with a flat car at
the end, shot suddenly out of the dark-
ness at a reckless rate of speed and ran
over his automobile, crushing it under the
car and that her husband received injuries
in the collision from which he shortly
afterwards died.

That her husband approached the cross-
ing driving his automobile so slow that
it was barely moving, not going faster than
2 miles an hour, and entirely under his
control; that before entering on the cross-
ing he looked up and down the railroad
track and listened for the approach of
trains and not seeing nor hearing any he
entered on the crossing; that there was no
light nor lookout at the end of the back-
ing train, nor at or near the crossing, and
he had no warning of its approach.

That the railroad company was guilty
of gross negligence and carelessness in
the operation of said train and that its
said negligence and carelessness was the
sole proximate and only cause of said
collision and of the death of her husband.
She claims individually and as tutrix $39,-
000.00 damages, with interest.

The railroad company filed an exception of no cause of action, which being overruled it answered, denying the negligence and carelessness alleged by plaintiff and averred that the collision was due solely to the fault of the deceased. Its answer admits that the rear end of the backing train which it was operating collided with the automobile operated by Mr. Blanchard, plaintiff's husband, and that there was no light actually on the rear end of the train but avers that the crossing was amply protected by a flagman with a lighted lantern and urged that if defendant was guilty of fault and negligence the decedent, James M. Blanchard, was guilty of contributory fault and negligence in that he did not stop, look and listen before entering on the crossing.

That if he had stopped, looked and listened or had done so at a time and place where the looking and listening would have been effective, he would have seen and heard the approaching train in time to have stopped his automobile and prevented the collision, that his failure to do so precluded recovery by plaintiff.

That said Blanchard was guilty of fault in that he did not look for nor see nor hear the flagman who tried to stop him before he drove upon the track, etc. Judgment was rendered in the lower court in favor of the plaintiff individually and as tutrix for $16,500.00, with interest.

Defendant moved for a new trial which, being overruled, it appealed.

Defendant and appellant has moved this court to set the judgment appealed from aside and remand the case to the lower court for a new trial or that defendant be authorized to take testimony in the lower court to prove certain facts alleged in the motion.

There is no provision for a remand for such a purpose in our Code of Practice; except that all courts have power and authority and it is their duty to accomplish justice and as long as a case is under our control we have that power and to that end such motions are not unknown in our jurisprudence. The motion to remand will be considered first.

The ground in the motion to remand that the decedent, while pinned underneath the car, had been heard to say that "he saw the little light" is one of the grounds urged in the motion for new trial. This matter was, therefore, known to defendant previous to the appeal. It was not substantiated on the trial of the motion for new trial by any evidence.

The averment in the motion to remand that the deposition of the man named Deckler, of Center, Texas, can be obtained in case of a remand; is not coupled with any averment that it could not have been done just as well in support of the motion for new trial or as part of defendant's testimony on the trial in chief in the lower court.

It would be unreasonable to remand the case now to give appellant an opportunity to take Deckler's depositions when it could have done just as well for the trial in the lower court. Not only that, but the result of a remand for the purpose would be uncertain.

Another ground for the remand prayed for is that Cleveland Conley, witness for plaintiff, testified in the lower court that he had not been charged with any crime; when as a matter of fact he was at the time charged with desertion from the army.

That the court in deciding the case relied largely on his evidence. The record of the War Department annexed to the motion shows that a Cleveland Conley deserted August 4th, 1921.

This case was tried in the lower court June 11th, 1923, therefore between the date

of the desertion charged and the trial there intervened 2 years and 10 months. According to the testimony of the witness and that is all the information we have concerning his whereabouts during this interval of time he has not concealed himself. The motion to remand does not suggest any reason why he has not been arrested on the charge of desertion. Due to the lapse of time since the date of the charge and the fact that he has not been arrested on such a charge, and nothing indicates that he has evaded arrest, we incline to the view that this witness is not wanted by the government on said charge.

Then, again, suppose the witness to be the party charged; the charge is open to investigation, and his declaration that he had not been charged, etc., does not bear directly on the facts testified to by him concerning the merits of the case.

The result of a remand for the purpose of proving the desertion would be uncertain. We do not think the case should be remanded on this account.

Another ground urged in the motion to remand is that the witness, Conley, testified in the lower court that he was with a party at the time of the collision whose name he did not know, who saw the collision, etc.; that he thought the party worked in the shop at Meridian, La.; that the court in deciding the case had largely relied on this witness and his testimony that a party was with him and saw the collision was untrue, etc.; that diligent inquiry made at Meridian had not located anybody there who had been with the witness in Oakdale and seen the collision, etc.

An ex parte report, etc., is annexed to the motion.

We find that Conley testified on the trial that a party came to him at the cafe in Oakdale the night of the collision and asked to be shown the way out to Meridian through the Bowman-Hicks Quarters; that he got into an automobile with the party and rode with him to the crossing, where they stopped, witness getting out; that the party said to him while they were together that he had taken the wrong road and two men told him to get out; that very soon after their automobile was stopped the collision occurred and he did not see the party any more; that the party with him saw the collision, etc.

Defendant could have ascertained from Conley while interrogating him the cafe mentioned by him and made inquiry there if such a party had been seen there or going to or coming from there; could have made inquiry in the quarters of a city of the size of Oakdale and ascertained whether any stranger had been seen in there and required to leave on the night of the collision and summoned witnesses in rebuttal, or could have attacked the statements of the witness in a motion for new trial; summoned witnesses and investigated the matter in the lower court.

The report annexed to the motion is not sufficient for any purpose. It would be unreasonable to remand the case in order to give defendant another opportunity to do what could have been so easily done in the lower court. A remand for the purpose might lead to nothing.

Another ground urged in the motion to remand is that the witness, Charles Robinson, testified on the trial in the lower court that John Snowdon was present at the wreck; that defendant had discovered that such was not the case; that the lower court had relied largely on the testimony of this witness, etc. Two ex parte affidavits are annexed to the motion in support of this ground, one signed by a party named Fred Snowdon, who says he also goes by the name of John Snowdon, and

that he was,not at the collision; another by a party named Willie Snowdon, who says he was not at the collision. We find that Charles Robinson testified on the trial that he had talked with John Snowdon, the party he mentioned, the day previous to the trial in Oakdale and stated the locality in which the party lived in Oakdale. Defendant could have summoned John Snowdon in rebuttal or could have urged the question of his presence at the collision, as claimed by the witness, in a motion for new trial and summoned the party, etc. Defendant does not show due diligence in the lower court; besides, the result of a remand for the purpose would be uncertain as to the effect on the testimony of Robinson.

The certificate from the War Department excepted, the reports annexed to the motion do not purport to be investigations personally made by the attorneys for the mover, nor to have been made under their personal supervision. A credit which they are not receiving would have been given thereto had such been done.

The showing made for the remand prayed for is not sufficient.

The motion to remand is refused.

The rulings of the lower court overruling the exception of no cause of action and on the ground that the deceased had while pinned underneath the car been heard to say that "he saw the little light" were correct. Our judgment on the merits will dispose of the motion for new trial on ground that the judgment appealed from is contrary to the law and the evidence.

There is no dispute about the fact that the collision occurred a little after midnight on a frequently used highway crossing of defendant's railroad in the City of Oakdale. That defendants' freight train containing 31 cars which had come into Oakdale from the west and pulled east far,

enough to get on a switch, was backing west on the switch track at about 4 miles an hour with no lights nor lookout at the end of the backing train; that the forward end of the leading car struck the Blanchard omnibus as it got about half-way over the crossing.

And it cannot be denied that Mr. Blanchard should have stopped and looked and listened and in a way that his looking and listening should have discovered under ordinary circumstances the approach of a nearby train and seen a light or flagman on the crossing if such was there at the time.

Plaintiff claims that the evidence shows that he did look and listen, that the darkness prevented him seeing the nearby train; that it made such little noise as it approached him that it did not attract attention and he, therefore, failed to hear it; that the crossing was wholly unprotected.

Witnesses speak of the night as dark, but it was not too dark for Cornelia Groves, Clarence Landrum and Ernest Ford, occupants of the Blanchard omnibus, to see clouds and stars in the sky, trees and houses on the side of the highway as they passed them on their way to the crossing and the crossing when they reached it.

Mr. Blanchard was driving north on the highway and sitting on the left hand side of the front seat of his omnibus; Cornelia Groves was seated on the same seat with him at his right, Clarence Landrum on the right-hand side of the vehicle near the middle, Ernest Ford on the right-hand side near the rear end. The position in which Mr. Blanchard and Cornelia Groves were seated shows that the front seat faced the way the omnibus was going, from which there being no evidence to the contrary we assume that the other seats faced the same way which caused Clarence Landrum

and Ernest Ford to face the way they were going.

Clarence Landrum and Cornelia Groves testify that when Mr. Blanchard got within about 10 ft. of the crossing he stopped; that his omnibus stood still about 3 minutes, but Ernest Ford says the automobile did not quite stop running; but all say that he drove up to the crossing very slow, so slow that a child could have stepped out of the automobile without stumbling; they estimated his speed at about 4 miles an hour as he came up to the crossing, and they all say that he looked up and down the track and listened before he drove on it.

Cornelia Groves and Clarence Landrum say that they also looked and listened for trains and did not see nor hear any; did not see any light or flagman at the crossing; that nobody hollered at them; according to their testimony there was no light nor flagman at the crossing. They further testified that there were no curtains on the omnibus, that it had glass windows through which they could see; that the 2 front windows were up; some of the others were up; some were down; that the train struck them as they got half-way across the track, and that they were not aware of its presence until it struck them.

Another witness named Hargrove testified without objection that Mr. Blanchard, while being carried from the wreck to the doctor's office, stated: "If they don't put somebody on the crossing there will be more killed than was here tonight," and that after reaching the office he said: "That there wasn't anybody on the crossing and that he didn't see anything nor hear anything.

Charles Robinson, witness for plaintiff, testifies that he was walking along the highway on the east side of it and on the south side of the railroad and going toward the crossing; that Mr. Blanchard's truck or omnibus passed him going to the crossing when he was about 100 ft. south of it, and he saw the collision, was looking right at it, that his view was unobstructed, the headlights of the omnibus showing bright. He did not see any light or flagman at the crossing; he did not hear anybody holler at Mr. Blanchard from the crossing, and did not see nor hear the train until it struck the truck. He was not asked whether or not Mr. Blanchard stopped before entering on the crossing and looked and listened; but asked as to his speed at the time he passed him about 100 ft. south of the crossing says he was going slow, and asked how he went on the crossing says he went on it slow. This witness being on the east side of the highway, was in good position to see a train on the same side backing toward the crossing, if any could be seen or heard.

Cleveland Conley, witness for plaintiff, testified that he saw the collision from the north side of the railroad at a distance of 15 or 20 ft. from the crossing. He had just driven up to the crossing in an automobile with another party; their automobile went dead, the party he was with and himself both got out; the party he was with started to crank his automobile when he noticed Mr. Blanchard coming and stated he would wait until he had passed. Witness says as soon as the automobile he was in stopped running and he got out of it he noticed the box cars backing toward the crossing some distance away; he then noticed Mr. Blanchard coming about 20 ft. distant from the crossing and turning his eyes saw about the same time the leading flat car about the same distance from the crossing and repeatedly says that in a second afterwards the collision took place; that he did not see nor

hear the flat car until a moment before the collision.

His view was unobstructed; the headlights on Mr. Blanchard's omnibus as it approached showed bright; the evidence does not enable us to say whether witness was on the east or west side of the highway.

He was not asked whether Mr. Blanchard stopped, looked and listened before entering on the track, but was asked whether Mr. Blanchard's truck was going slow or fast as he approached the crossing, and answered that he approached it very slow and drove on it running slow, about as slow as a Ford car will run, which he estimated at about 4 or 5 miles an hour.

It was incumbent on plaintiff to show that Mr. Blanchard stopped and looked and listened for a time and in a way that under ordinary circumstances the near-by train would have been seen or heard; no matter whether the railroad company took precautions to protect the crossing or not.

The positive statements of Cornelia Groves and Clarence Landrum that he did stop, about 3 minutes, is not entirely negatived by Ernest Ford that he did not quite stop running; nor by the testimony of Charles Robinson and Cleveland Conley, who were not asked the direct question and their general statements rather indicate that they could not have stated exactly either way. We are satisfied from the evidence that he came to a full stop, but certainly if he did not come to a full stop he had, according to the evidence, his automobile running so slow as he came up to the crossing that it was entirely under his control and could have stopped almost instantly, and that his approach was so slow that he was enabled to look up and down the track and listen before he entered the crossing, and actually did so. The evidence shows that his view was unobstructed except by the darkness. We

are satisfied that the end of the backing train, a low flat car, then a coal car, then a flat car, then a box car leading in the order named, with no light nor lookout on the end of the leading car, moving slowly in the dark not over five miles an hour, the locomotive about 1000 ft. away was not conspicuous to the occupants of Mr. Blanchard's truck, like a box car would have been had it been at the end of the train or the trees and houses on the side of the highway as they passed them, nor the graveled crossing as they came up to it. Charles Robinson, about 100 ft. south of the crossing and on the east side of the highway, did not see nor hear it until it struck Mr. Blanchard's truck. The automobile in which the witness, Conley, was riding had stopped, its engine had died and he had gotten out of it, yet he did not see nor hear the flat car ahead of the box car until it had come within about 20 ft. of the crossing and only a second before the collision.

If Mr. Blanchard had stopped his truck, killed his engine and gotten out of it when within 20 ft. of the track he would, no doubt, have heard and seen the flat car as soon as did the witness Conley, but ordinary prudence and caution did not require him to stop his automobile, kill his engine and get out and then look and listen before attempting the crossing. The Stop Law was not in force at that time.

Seated in his automobile, his engine running, although within about 20 ft of the track, the nearest box car some 70 ft behind the nearest and leading flat car, moving in the darkness as slow as stated, with no light on the leading car; the leading flat car was invisible to him and did not make enough noise to attract his attention, and in the absence of a light or flagman at the crossing, he no doubt believed and had the right to believe that the crossing was safe.

Defendant admits in its answer that there was no light at the end of the backing train but avers that the crossing was amply protected by a flagman with a lighted lantern.

The burden of proof is upon the defendant to establish this defense.

Defendant's principal witness is Henry West.

This witness was a brakeman on the train, and testified that he was at the crossing and, seeing Mr. Blanchard's automobile coming up at about 25 or 30 miles an hour, he waved his lantern on the crossing, but Mr. Blanchard did not stop but came on and he then hollered at him and was forced to step back on the south side to keep the automobile from hitting him. That immediately upon the collision he ran around the end of the train and flaged the engineer with a washout signal.

Will Stephenson, the other brakeman, witness for defendant, testified that he heard Henry West holler and turned around, looked back and heard him flag across the dirt road Stop! Stop!; that he saw the lights of the automobile, 25 or 30 ft. from the crossing, coming on not under 15 miles an hour, and it kept on coming until it was hit. That he was 7 or 8 cars from Henry at the time, or about 100 yards from the crossing, but he afterwards modified his statement.

Garland Sullender, conductor on the train, testified that he saw Henry West blocking in the middle of the track and after the lights of the approaching automobile came at him he gave the emergency signal to stop. That West stayed at the crossing until the automobile was hit, etc.; that he heard West holler from the middle of the crossing, saw him giving signs, saw him give the washout signal to the engineer.

R. B. Marshall, engineer, testified that he had backed his train about 120 ft. before he saw the washout signal and that when he got it he threw on the brakes, the signal calling for the emergency brakes.

The testimony of Henry West that Mr. Blanchard's automobile came up to the crossing running about 25 or 30 miles an hour is weakened by E. O. Davion and Ben Hargrove, who testify that the Blanchard truck was worm-driven and not capable of making over 18 or 20 miles an hour. His statement that immediately after the collision he ran around the end of the train and gave the washout signal to the engineer is weakened by witnesses for plaintiff and defendant, as follows:

Will Stephenson, the other brakeman, testified that about 4 cars passed the crossing after the collision.

Mr. Sullender, the conductor, says that the train backed over the crossing "not much over 4 miles an hour."

Charles Robinson says that the train drove the Blanchard automobile about 4 car lengths west of the crossing before it stopped.

Curtis Johnson says that it was about 70 yards from the crossing to the place where the end of the flat car with the automobile under it was stopped.

Cleveland Conley said that the train backed over the crossing about like a man goes when he walks real fast; he estimated the speed at about 4 or 5 miles an hour.

R. B. Marshall, engineer, says he had backed the train about 120 ft. at the time he got the washout signal; that he applied the emergency brakes as soon as he got it, etc.

It is not contended that the engineer was not on the lookout or dilatory in getting the washout signal and stopping the train.

It, therefore, appears to us that Henry West did not run around the end of the

train immediately after the collision and give the washout signal, else the slow-moving train would not have continued backing for about 4 car-lengths west of the crossing after the collision but would have stopped under emergency brakes almost immediately they were applied. We conclude that he was not at the crossing at the time of the collision; that he saw the collision some distance away and ran around the end of the train and gave the signal as soon afterwards as he could.

Our conclusion finds support in the testimony of the witness Conley who testified that he saw a man with a dim lantern about 30 ft. east of the crossing and on the north side of the railroad just before the collision and that "after the train had stopped" he saw two members of the train crew come from east of the crossing to the place where the automobile was under the end of the train and that one of them was a negro with a lantern. The whereabouts of the brakeman West at the time of the collision, is strongly disputed by plaintiff and defendant.

The witness Conley appears to be the most definite witness on the subject. He is reported as saying in one place on cross examination; transcript, p. 137:

Q. This brakeman you saw was on the south side of the train?
A. Yes Sir.

We regard this answer as inadvertent because previously and subsequently in answering questions about the matter; put in a way in which his answers were bound to be intentional, he says he was on the north side and that he saw a man with a dim lantern on the same side about 30 steps east of the crossing which we take it was the brakeman West: See his testimony transcript. pp. 129; 130; 132; 137; 144; 145; 148. His testimony on pages 144 and 145 is as follows. Re-direct page 144.

Q. In regard to where this man was standing at the time of the collision was he standing on the side you were on or on the other side?
A. The side I was on. Question by the court.
Q. Was the train between you and him?
A. No Sir.
Q. When you saw him had the train backed up toward the west until it had got even with him?
A. He was about 5 or 6 cars down from the end, from the end of this flat car down away from the track.
Q. When you saw him?
A. Yes Sir.       Re-direct.
Q. The same side you were on?
A. Yes Sir.
Q. Do you know where that south stand is down there?
A. Yes Sir.
Q. How far is that switch stand from the crossing?
A. I don't know Sir.
Q. Was he any where near that switch stand?
A. The switch below the crossing. He was crossing over it at a little space from the track, the man with the lantern had just walked off from the track. He was standing off when I saw him.
Q. Were you on the north side of the track or on the south side?
A. On the north side.
Q. Which side was he on?
A. North side.
Q. Which direction from the crossing?
A. East of the crossing.
Q. When you went to see Mr. Blanchard when he was under the truck, what did you say on cross examination about the man with the lantern?
A. I saw a negro with a lantern go up there.
Q. Was that the same man you saw with a lantern up the track?

A. I suppose it was.
Q. Was he a white man or a negro?
A. A negro.        Transcript p. 145.

The witness Conley apparently has no interest in the case and his answers are very straightforward throughout.

He places Henry West on the north side of the railroad and east of the crossing at about the time of the collision.

The testimony of defendant's other brakeman Stephenson that he heard Henry West holler and turned around, looked back and heard him flag Stop-Stop across the dirt road is deprived of weight in our estimation by his further statement that he was 7 or 8 cars from the crossing at the time because even if Henry West was on the south side of the track as he claims he could have seen at that distance the lighted lantern if he had one, but he could not possibly tell at that distance say about 100 yards whether Henry West was at or near the crossing at the time.

A like situation operates against the weight of the testimony of the Conductor when he says that brakeman West stayed at the crossing until the automobile was hit, that he saw West blocking in the middle of the crossing, etc., heard him holler, etc., because he says he was about 15 car lengths down the track from the crossing at the time, that is about 200 yards and if we suppose that Henry West was on the south side of the track at the time, the same side he was on; he could have seen a light in the lantern which West had; but he could not possibly at such a distance know nor see through the darkness whether Henry West was at the crossing at the time or close thereabouts.

We have not found such weak points in the testimony of plaintiff's witnesses. The switch east of the crossing and over which the backing train came from the main line, was lined up, supposedly by Henry West.

This switch stand according to J. C. Reed, defendant's civil engineer, is 11 ft. east of the crossing, but the clear proof that the train had backed only about 120 ft. when the emergency stop signal was received upon which it was stopped, no doubt almost instantly; the distance 120 ft. being about 4 car lengths, the distance that the train going about 4 or 5 miles an hour backed west of the crossing after the collision renders it incredible that the stop signal was given from this switch stand or from the crossing 11 ft. west of the same.

The district judge heard the testimony of Cleveland Conley, Charles Robinson and that of the two brakeman and the conductor and has furnished us with his observation on that subject. We have reached a similar conclusion concerning the facts of the case. He also visited the crossing.

In Cherry vs. R. R., 121 La. 471, 46 South. 596, a freight train backing in the day time over a highway crossing in the town of Minden ran over a wagon drawn by a mule. The court held; pp. 478. "One who on a public highway approaches a railroad track and can neither hear nor see any indication of a moving train is not chargeable with negligence in assuming that there are none sufficiently near to make the crossing dangerous."

In Holstead vs. R. R., 154 La. 1097, 98 South. 619, a freight train backing in the day time over a street crossing in the town of Ruston collided with an automobile which had entered on it without first coming to a full stop; said p. 1100: "Our conclusion is that every one—upon approaching a railroad crossing or any other place of known danger should so regulate his conduct as to be free from fault. If one can sufficiently see that the way is clear for him to pass without danger, he is justified in going on without stopping, but

if the view is obstructed, he should approach cautiously until a view may be had."

In Aymond vs. R. R., 151 La. 184, 91 South. 671, a train backing in the night time over a street crossing in the City of Alexandria ran over a messenger boy who had ridden a bicycle on the crossing without coming to a full stop; the court says, pp. 86, 87: "The night was dark, the crossing unguarded and poorly lighted. The train was backing without a light ahead to mark its presence and without a lookout preceeding it to give warning of its approach. The locomotive was several hundred feet to the rear, where the noise of the exhaust and whistle bell could be no indication that the dark and silent lead car was in motion.

This we hold to be gross negligence.

As to the obligation to stop before crossing a railroad track, that must not be accepted literally as to require a person upon approaching a railroad to come at once to a position of absolute immobility, but common sense and common practice both indicate that it will suffice for such person to have his own motion so checked and under control that he may instantly stop if need be."

In Kramer vs. R. R., 144 La. 57, 80 South. 198, a train backing in the night over a street crossing in the City of New Orleans ran over a policeman who was endeavoring to cross the street on foot. The court said pp. 61, 62: "Although the backing of a railroad train through a city and over street crossings at night is not of itself such negligence as should render the railroad company liable for any accident that may result; it is an operation of sufficient danger to the public to require the railroad company to maintain all reasonable safeguards, such as having a bright light on the forward end of the train and a lookout there in position to warn a person of danger. The defendant did not fulfill that duty to the public."

In Maher vs. R. R., 145 La. 733, 82 South. 872, a freight train backing in the night over a street crossing in the City of Baton Rouge ran over a man who was attempting to cross the street on foot. The court said pp. 738: "Our opinion is that it was gross negligence not to have a flagman on the crossing or a bright light or lookout on the rear end of the train under the circumstances. He had the right to believe and to act upon that belief that the railroad company and the train crew would have some regard for the safety of the public."

In Clement vs. R. R., 148 La. 1050, 88 South. 394, a train backing in the night over a street crossing in the City of Alexandria collided with an automobile. The facts are so similar to the facts in the present case that the cases are almost alike in that respect. A clause in the syllabus reads: "Where a train is backing at night over a crossing the gates of which are out of order with no light or lookout on the rear end of the train, the blowing of a whistle when the engine is more than 8 car lengths from the crossing is not sufficient warning of danger at the crossing."

In this case we are satisfied that the crossing in question was wholly unprotected; that defendant was guilty of gross negligence in not protecting it and that its negligence in that respect caused the death of plaintiff's husband and renders it liable to her individually and as tutrix for the damages she and her children have thereby sustained.

We have considered the amount which she should recover on said account. We find the judgment appealed from correct in every respect. It is therefore ordered adjudged and decreed, that the judgment appealed from be and the same is hereby affirmed; defendant and appellant to pay the cost in both courts.