No. 3924

**Second Circuit**

——

**BLOXOM ET UX. v. TEX. & PAC. RY. CO.**

——

(December 23, 1930.   Opinion and Decree.)
(January 27, 1931.   Rehearing Refused.)
(March 2, 1931.   Writs of Certiorari and Review Refused by Supreme Court.)

——

468

Herndon & Herndon and D. B. Samuels, of Shreveport, attorneys for plaintiffs, appellees.

Wise, Randolph, Rendall & Freyer, of Shreveport, attorneys for defendant, appellant.

WEBB, J. Plaintiff, W. E. Bloxom, and wife, Mrs. Daisy E. Bloxom, joined in this action against the Texas & Pacific Railway Company to recover damages sustained by them individually which resulted from the death of their son, Arthur Bloxom, who died following and as the result of injuries received when an' automobile driven by him was struck at a grade crossing at Lucas, Louisiana, where defendant has a flag station, by a passenger train operated by defendant.

The accident occurred in the afternoon of March 23, 1928, and plaintiff alleged in substance that their son approached Lucas from the south over a paved highway, which lies to the east of and practically parallels defendant's tracks; that he turned from the highway into a side road, referred to as the south road, which bears west from the highway leading over a spur track, referred to as the east spur track, thence over the main and passing tracks, referred to as the south crossing, and thence over a spur track, referred to as the west spur track; that the main and passing tracks curve from a point south of the south crossing to the northwest. Plaintiff further alleged that their son stopped at or near the railroad "stop sign" (which is east of the crossing at the east spur track, or about 59 feet from the east side of the main track at the south crossing), "where his view ' would be unobstructed, looked and listened for approaching trains, at which time there was a long freight train on the passing track, and his view of the main track north was obstructed by said freight train, except for a distance of about 180 yards from the crossing," and their son neither seeing nor hearing any train, started his car and drove over the first track (east spur track) and thence onto the main track (south crossing) and that he could not clear the track before the passenger train came along said track from the north, driven at a high and negligent rate of speed, without giving any warning of its approach and ran down and struck the automobile driven by their son; that from the direction (east) their son approached the crossing, he stopped his car at the proper place to have a clear and unobstructed view of the tracks north as far as he could see, which was approximately 540 feet, and that he could not see the main track farther on account of the freight train parked on the passing track and the curved tracks. Plaintiff further alleged that their son was without fault, and that the accident was due solely to the fault of defendant.

In answer defendant admitted plaintiffs' son had been killed, as alleged, and otherwise denied plaintiffs' allegations, especially denying that it was guilty of any fault, and that deceased was without fault, and alleged in event it should be held to have been guilty of any negligence, that plaintiffs' son was guilty of contributory negligence.

There was judgment rendered in favor

of W. E. Bloxom in the sum of $5,273, and in favor of Mrs. Daisy E. Bloxom in the sum of $5,000, with legal interest from judicial demand. Defendant appealed from the judgment and plaintiffs have answered the appeal, praying that the judgment be amended and judgment rendered in favor of W. E. Bloxom in the sum of $20,275, and in favor of Mrs. Bloxom in the sum of $23,317.

On trial, there was introduced in evidence a map or plan and photographs which show that the main and passing tracks are curved, and the location of the tracks with reference to the paved highway, south road, and the crossing at the east spur track, and main and passing tracks, or south crossing, to have been as alleged in plaintiffs' petition; which also show that at a distance of about 120 feet above the south road another side road, referred to as the north road, leads off from the highway, bearing towards the northwest, leading over the east spur track and thence over the main and passing tracks, referred to as the north crossing; that the main and passing tracks parallel each other for a distance of about a mile from the station building, which is located 21.5 feet east of the main track between the south and north crossings, which are 294 feet apart; that on the east side of the main track there is located a small building referred to as the "tool house," at a distance of 247 feet north of the north crossing; that the east spur track leads out from the main track south of the south crossing, bearing northeast, and passing to the rear of the station building; that the west spur track leads out from the passing track at a point opposite the station building, about 106 feet from the south crossing, and bears towards the southwest.

It is conceded that a freight train was parked on the passing track, which parallels the main track, on a rather sharp curve which continued some distance above the tool house, and that the view of the main track of one approaching the south crossing and when within an approximate distance of 21 feet of the south crossing would be restricted by the freight train and the curving track to a distance of about 540 feet, or to a point about the tool house, and that the distance one could see from the south crossing would be, as stated, and as shown by the map, or about to the tool house.

The theory on which plaintiffs apparently base their case is that when their son stopped before going upon the crossing, the train had not reached the tool house, and therefore that he did not see same, but that just as he started again, the train reached the tool house and that the speed of the train was such that the car of deceased was struck before it could clear the south crossing; while the theory of the defendant appears to be that the train was in view of the deceased when he is alleged to have stopped, and if not, that the train came within view before he reached the crossing, and that had deceased looked he would have seen the train and been able to stop before driving on to the crossing.

There were ten witnesses called on behalf of plaintiff, and six on behalf of defendant. Those called by plaintiff were Dudley, Mitchell, Schopini, Brown, J. C. and F. F. Webb, Jr., Roberts, Riggens, Marlin and Graham; and those called by defendant were Smith, New, McCormick, Hall, Leeper and Fried.

Dudley, Mitchell and Schopini claim to have seen the car which was driven by deceased just prior to or at the time of

the collision, and they gave their version of the accident and also stated that they had not heard any signals given of the approach of the train, and Dudley estimated the speed of the train at 40 to 50 miles per hour, and Schopini at 45 to 50 miles an hour, and Brown, J. C. and F. F. Webb, Jr., stated that they had not heard any signals of the approach of the train and estimated the speed of the train at 35 to 40 miles per hour; while Roberts, Riggens, Marlin and Graham, who were from one-half to a mile above the station building, said they did not hear any signals given for the crossings and they also estimated the speed of the train.

The witnesses for defendant, Smith, the engineer, and New, the fireman, on the passenger train stated that the signals had been given of the approach of the passenger train and their statements were confirmed by the statement of McCormick, the conductor, and Hall, the flagman, on said train, and also by Leeper, the conductor on the freight train which was standing on the passing track, and their estimates of the speed of the train at the time it reached the tool house were from 25 to 30 miles per hour. H. Fried, the engineer, who made the map or plan filed in evidence, gave the distance as stated above between the south crossing, the north crossing and the tool house and the location of the station building, and he also stated that the distance from the "stop sign" on the south road east of the east spur track was approximately 59 feet from the east rail of the main track at the south crossing and that the distance between the west rail of the east spur track to the east rail of the passing track at the south crossing was 21.4 feet, and the distance from the south crossing to the point where the west spur track leads out from the passing track and the distances be-

tween the south road and the north road were estimated by Schopini and Dudley respectively.

Considering the testimony of the witnesses relative to whether or not the signals were given of the approach of the train to the crossings and their estimates of the speed of the train: Roberts was working on the track about a mile from Lucas and he said that a crossing signal consisting of two short and two long blasts from the whistle was given as the train approached the place where he was working and that he did not hear any other signal given after that time; Riggens said that he was working in a field about three-fourths of a mile above the station, that he saw the train and it was coming pretty fast, but he did not know whether it blew the whistle or not; and Marlin and Graham, who were working about one-half mile above the station, stated that they had heard a signal from the train before it reached the point where they were working, but they did not hear any other signals thereafter, and they estimated the speed of the train as being very fast and at the rate of 45 or 50 miles per hour.

While it appears that Graham and Marlin should have heard the signals given for the crossing, if such were in fact given, as they would have been within 2,000 feet of where the first signals are stated to have been given, it is not unusual that they should not have heard the signals, and the same is especially true as to Riggens and Roberts, and we regard their testimony as of the weakest of negative evidence.

Brown, J. C. and F. F. Webb, Jr., were a short distance from the accident and at a comparatively short distance from the place where the signals are stated to have been given, and if they had been paying

any attention to the trains, it would appear certain that they would have heard the signals, if they had been given. J. C. and F. F. Webb, Jr., however, said that they did not pay any attention to passing trains and that fact that they did not know whether the signals were given was of little significance, and while they estimated the speed of the train at 35 to 40 miles an hour, the evidence shows that they saw the train for a very short distance, and F. F. Webb, Jr., said that he did distinctly remember that the bell was ringing when the collision occurred. Brown was working at a cane mill which was operated by a tractor, which concededly made a great deal of noise and the evidence does not show that he was paying any attention to the train or that he saw the train until it came from behind the freight train, the rear end of which was said to have been within 106 feet of the south crossing, and he stated that he had not heard any signals, and estimated the speed of the train at 40 miles per hour.

The evidence of those witnesses shows that they were not especially qualified to estimate the speed of trains, that they saw the train for only a short time, and their evidence also shows that they were not paying any attention to the train.

Dudley, Mitchell and Schopini, who claim to have seen the accident, were also near the place where the signals from the locomotive were claimed to have been given, or approximately 1,000 feet from the place where the last signal is stated to have been given, and as stated, they all said they did not hear any signals given and, with the exception of Mitchell, they estimated the speed of the train.

Dudley said that he was driving in an automobile behind Arthur Bloxom as they approached Lucas; that when young Bloxom turned into the south road he continued on the highway and turned into the north road, passed over the east spur track and stopped at a short distance from the north crossing, which was blocked by the freight train; that he looked back towards the south road where he saw the car driven by Arthur Bloxom stopped and just starting off from a point on the south road near the "stop sign," and with relation to the position and speed of the train at that time his testimony was in part as follows:

"Q. When you stopped there where was the train?

"A. The train was just along about between the tool house and the depot, coming in the curve.

\* \* \* \* \* \* \*

"Q. Just about that time the train was coming around the corner?

"A. The train was already opposite to me, just all at once. The train was between the tool house and the depot, wasn't but just one hundred yards. The train was just between the tool house and the road. That is, my crossin'.

"Q. Was that train going fast or slow?

"A. Oh, it was running fast. I imagine it was running about 40 or 50 miles an hour.

\* \* \* \* \* \* \*

"Q. After Mr. Bloxom started up you could not see him on account of the depot?

"A. I could not see him, no sir. \* \* heard it when it hit him and I backed up."

Mitchell, who said he was driving an automobile behind Dudley and that he turned into the south road and followed Arthur Bloxom, was unable to say whether young Bloxom stopped, but he stated that he was driving very slowly (which was also said to have been the case by Dudley and Schopini) and that he did not hear or see the train until the moment of the collision.

Schopini said that he was walking along the north road at a distance estimated by

him as between 250 and 300 yards west of the north crossing, stated that he had seen the automobile driven by Arthur Bloxom as it approached Lucas, when it turned into the south road and until the collision; that deceased stopped about 15 or 20 feet from the south crossing for a few seconds before driving onto the crossing, which place he stated appeared from the angle he viewed the scene, as east of the "stop sign" (the place, however, being subsequently located by the witness with relation to one of the photographs as between the south crossing and the east spur track which, as stated, the evidence shows was 21.4 feet), from which point the witness stated that one had a view of the main track north as far as the tool house or, as stated, a distance of approximately 540 feet.

The evidence of Mr. Schopini relative to the position of the train when he saw Arthur Bloxom stop, as well as to other matters, is very conflicting with itself. At one time when asked as to the position of the train when young Bloxom stopped, he answered, "He (Arthur Bloxom) was possibly 15 or 20 feet when he stopped and then the train was right at him and he started again just in time for them to come together"; but thereafter he stated that the position of the train when Arthur Bloxom stopped was within the curve, about the tool house, above the tool house, and a little bit above the tool house; but it clearly appears from the testimony of Mr. Schopini that the last positions were merely estimates, as he stated that the freight train obstructed his view of everything above the north crossing.

Smith and New, the fireman on the passenger train, stated that the signals were given for the crossings, and they estimated that the speed of the train after the first crossing signal was given was about 25 miles per hour, and their testimony was supported by the statements of McCormick and Hall, and also by the statement of Leeper who, it is conceded, had been ordered to place his train on the passing track and await the passing of the passenger train. The estimates of the latter witnesses, being as to the speed of the train, from 25 to 30 miles per hour.

Considering the testimony of the witnesses, it is certain that the witnesses called by defendant were more competent to estimate the speed of the train than those called by plaintiff, and that their testimony relative to whether or not the signals were given was positive; while that of the witnesses called by plaintiff was negative. The plaintiff bore the burden of proof and we are of the opinion that the evidence failed to establish that the signals were not given or that the speed of the train was above 30 miles per hour. However, it does not, we think, follow that the operators of the train were not guilty of negligence merely because the signals were given of the approach of the train and continued to be given or that the train was operated at a speed of 30 miles per hour.

Considering the allegations of the petition, it is clear, we think, that the charge of negligence against defendant related to the operation of the train under the conditions created by defendant in parking the freight train on one of the curved parallel tracks, restricting the view of the operators of the train as well as persons who should desire to cross the track; but passing any question as to whether or not defendant was negligent in operating the train at a speed of 30 miles per hour under the conditions presented, which is not argued by counsel, evidence was intro-

duced, or rather the engineer, Smith, said that he had not seen the deceased if he stopped and that he had not seen the automobile driven by deceased until after the collision; while the fireman, New, said that he was maintaining a lookout, and stated that he had not seen the car until the moment of the collision.

Considering the situation presented, we are of the opinion that the statement of the engineer and fireman shows that they were at least not maintaining such a strict lookout as the situation required and we are of the opinion that defendant was negligent in that respect, and if the evidence shows that such negligence was the cause of the accident, defendant would be liable unless the deceased was himself guilty of negligence. As stated, there appears some conflict in the testimony of the witnesses Dudley, Mitchell and Schopini relative to the place where deceased stopped, as well as to the position of the train at the time, and while counsel for both parties appear to recognize that there is such conflict, there is not any attempt made to reconcile the testimony. Counsel for appellant, taking the position that, considering the case with relation to the testimony of either Dudley, Mitchell or Schopini, says it shows that deceased was negligent; while counsel for appellees say that neither of the witnesses testified positively as to the exact place where deceased stopped, but that the legal presumption is that he stopped for only one reason and that was to look and listen for approaching trains, and in order to do that he certainly stopped at a point where his view would be effective, and neither seeing or hearing an approaching train, he had a legal right to proceed to cross the track, assuming that no train would be near enough to render the crossing dangerous.

There is not any necessity to reconcile the testimony of the witnesses relative to the rate of speed at which the car driven by deceased approached and drove upon the crossing, as all of the witnesses stated that deceased drove very slowy, and there is not any necessity of reconciling the testimony of Mitchell with either that of Schopini or Dudley as Mitchell did not testify to any other fact than that the deceased was driving slowly. But there is an apparent conflict between the testimony of Dudley and Schopini relative to the place where deceased stopped before driving on the track and also as to the position of the train at that time. It is clear, however, that the testimony of Schopini relative to the position of the train at the time he claims to have seen deceased stop is conflicting, and if we accept the statement of Schopini that the train was right at the deceased when he stopped and that deceased started just in time to collide with the train, with the evidence showing that the deceased could have had a view of the track for 541 feet, it would appear that deceased was at fault, but there being so many conflicts in the testimony of Schopini, we are of the opinion that the testimony of Schopini is of little weight. However, accepting the statement of Dudley, it appears that when the train, which was 350 feet long, was between the tool house and the north crossing or station building, young Bloxom was at the "stop sign," east of the east spur track on the south road, or at a distance of 59 feet from the main track at the south crossing. And whatever may have been the speed at which young Bloxom was driving his car, the evidence shows that there was ample space between the south crossing and the east spur track for him to have stopped his car or to have observed the main track for a distance of

540 feet, and unless it may be that after young Bloxom stopped at the "stop sign" (where we assume he looked and listened for trains and neither saw nor heard any approaching) he was warranted in continuing without paying further attention to whether or not any trains were approaching, he must, we think, be held to have been guilty of negligence.

Plaintiff contends, however, that he was warranted in so proceeding, citing in support of the contention Cherry v. L. & A. Railway Co., 121 La. 471, 46 So. 596, 17 L.R.A. (N.S.) 505, 126 Am. St. Rep. 323, and Eichorn v. N. O. & C. R., etc. Co., 112 La. 237, 36 So. 335, 104 Am. St. Rep. 437.

In the cases cited, the crossings were situated in towns or cities and the obstruction was on one of the tracks, which apparently paralleled each other and at a short distance from the crossing; while in the present case, the crossing was in the country near a plantation store and deceased was thoroughly familiar with the crossing, knowing that there was ample room for him to stop between the south crossing and the east spur track, at which place the evidence shows the deceased had the best view of the main track, and we do not think that the situation presented in the cases cited was similar to that presented in the instant case. We are therefore of the opinion that under the evidence, young Bloxom was himself guilty of negligence, which at least contributed to the accident, and that plaintiffs cannot recover.

It is therefore ordered, adjudged and decreed that the judgment appealed from be avoided and reversed and plaintiffs' demands rejected at their cost.