(82 South. 872)

No. 23294.

MAHER v. LOUISIANA RY. & NAV. CO.

(June 30, 1919.   Rehearing Denied Oct. 14, 1919.)

*(Syllabus by Editorial Staff.)*

1. RAILROADS ⬤⟲307(4), 312(1) — GROSSLY NEGLIGENT CAUSING INJURIES AT CROSSING.

Railroad *held* grossly negligent in not keeping a flagman at a crossing, where its backing train injured plaintiff, or a bright light or lookout on the rear end of the train.

2. RAILROADS ⬤⟲324(1) — PLAINTIFF NOT GUILTY OF CONTRIBUTORY NEGLIGENCE AT CROSSING.

Plaintiff, injured at a railroad crossing, when the unlighted rear end of a cut of cars backed into him, *held* not guilty of contributory negligence, though he could have crossed safely, had he walked faster, or started as soon as the train had left the crossing, before it backed down on him again.

3. DAMAGES ⬤⟲134(2)—AMOUNT ON PERSONAL INJURY REDUCING EARNING CAPACITY.

An expert machinist, capable of earning from $5 to $7.50 a day, but able to do only very light work at $2.50 a day since a railroad crossing accident which broke a rib, etc., *held* entitled to $3,000 damages.

Monroe, C. J., dissenting.

Appeal from Twenty-Second Judicial District Court, Parish of East Baton Rouge; H. F. Brunot, Judge.

Action by George O. Maher against the Louisiana Railway & Navigation Company. From a judgment for defendant, plaintiff appeals. Judgment annulled, and judgment for plaintiff ordered.

Leslie A. Fitch, of Baton Rouge, for appellant.

Laycock & Beale, of Baton Rouge, and Wise, Randolph, Rendall & Freyer, of Shreveport, for appellee.

O'NIELL, J.   Plaintiff appeals from the verdict of a jury and a judgment of the district court, rejecting his demand for $12,000 damages for personal injuries.

He was struck and knocked down by a freight train, backing across a street, at night. The negligence complained of was that there was no flagman at the street crossing, no light nor lookout on the rear end of the train, nor warning of any kind given of the approaching train. Defendant denied the negligence alleged, and, in the alternative, pleaded contributory negligence.

The accident occurred at the intersection of North boulevard and Fifteenth street, in the city of Baton Rouge, at 11:45 at night. The train was backing south, down Fifteenth street, at a speed of 6 or 8 miles an hour, at the time of the accident. Plaintiff was going east, walking along the north side of North boulevard. The defendant company has a switch track, as well as its main line, crossing North boulevard at Fifteenth street; the switch track being parallel with and close on the east side of the main line along Fifteenth street. There was a switch stand about 40 feet north from the boulevard, and another about 50 or 60 feet south from the boulevard. There was no light at or near the street crossing. It had been raining and the night was unusually dark.

When plaintiff approached Fifteenth street, the locomotive, pulling a train of 12 or 14 freight cars, was approaching the boulevard from the south on the main line. It was what trainmen call "a cut of cars," for a train that was being made up.

Plaintiff, seeing the train approaching, stopped at the end of the pavement, a few feet west from Fifteenth street, and filled and lighted his pipe while waiting for the train to pass. He thought the train would go as far beyond the boulevard as the switch stand, about 40 feet north from the boulevard, and would perhaps return on the switch track on the east side of the main line. He lived in the neighborhood and was familiar with the situation. His reason for

standing at the end of the pavement while the train was passing, in preference to proceeding out upon the street crossing and standing close to the track, was that the sidewalk from the end of the pavement to Fifteenth street was, like the street crossing, unpaved and very muddy. The last car in the train was a tank car, black or of very dark color, without a lantern, and hardly visible from plaintiff's position.

When the train had cleared the crossing and disappeared, plaintiff, seeing no evidence of its returning, proceeded to cross the tracks, groping in the darkness and picking his way through the muddy crossing. The train had stopped, probably not so far above the boulevard as was the switch stand, and was returning on the main track. The end of the tank car struck plaintiff just as he was stepping over the east rail of the main track, and knocked him into a ditch on the north side of the boulevard, 10 or 12 feet east from the track.

Two colored men on the south side of the boulevard saw the accident, and a third, who had crossed the track on the south side of the boulevard immediately after the train had passed going north, saw one of the two others going to help plaintiff up, and went to his assistance. Plaintiff was in a semiconscious condition and unable to walk. Three white men came while one of the colored men was helping plaintiff to his home near by. The testimony of the colored witnesses corroborates that of plaintiff in every important particular, and so does the testimony of the white men, as far as it goes.

The train crew consisted of the engineer and fireman, who, of course, were on the locomotive, the head brakeman, who was at the head end of the train, receiving signals from the rear brakeman and communicating them to the engineer, and the rear brakeman, who had jumped off the rear end of the train and thrown the switch, at the switch stand below the boulevard. There was no flagman at the crossing, and not a member of the train crew saw the accident, or knew that one had occurred, until they were asked for a report by the officials of the railroad company, the next day, or some days later.

When the case was called for trial, nearly two years after the accident, defendant filed a motion for a continuance because of the absence of the rear brakeman, an important witness, residing in New Orleans, who had been drafted for service in the army. To avoid the continuance, plaintiff admitted that, if the witness were present, he would testify as alleged in defendant's motion for a continuance. The allegation was that the absent brakeman would swear that, just before the train backed across the boulevard, he walked to the middle of the street and signaled the train to back up, which it did; that no one was on the track, and he saw no one near at the time; that he flagged the crossing during the whole time the train was switching, and that no one was struck by the train that night; and that, if any one was hurt, he must have gotten hurt after the end of the train had passed the crossing.

The admission that the rear brakeman did not see any one on the track or near by, and did not know that a man was hurt on the crossing that night, is a direct contradiction of the statement that the rear brakeman went from the switch stand to the crossing and was standing there flagging the train when it backed across the boulevard. The brakeman could not possibly have been on the crossing flagging the train without witnessing the accident. There appears to be no dispute of that fact. The plaintiff and three other witnesses who were there swear that no one flagged the train at the crossing; and there is no corroboration of the statement to the contrary, attributed to the rear brakeman. Of the other members of the train crew, only the engineer and the head brakeman testified; and neither of them was in a position to see whether the rear brake-

man was on the crossing, or at the switch stand on the south side of the crossing, when he flagged the train back. The track is straight for a distance of 200 or 300 feet above the boulevard, whence it curves to the west, so that the engineer, from his position at the right or east window of the cab, could not see the rear brakeman's signals, whether given from the street crossing or from the switch stand below the crossing. For that reason, the head brakeman was stationed near the head end of the train, where he could see the rear brakeman's signals and the engineer could see his. The head brakeman was therefore 400 or 500 feet above the crossing, at which distance he could not possibly know whether the rear brakeman's signal was given from the crossing, or from a point 50 or 60 feet below the crossing, especially as it appears that the rear brakeman had to go some distance east from the track to be sure that his signal could be seen at the head end of the train.

There are some contradictions, as to details of no importance, in the testimony of the colored witnesses to the accident; but what they have said seems in most part plausible and trustworthy.

The engineer testified that the bell on the locomotive was ringing while the train was backing to and across the boulevard; but the plaintiff and the other witnesses who were at or near the crossing testified that they did not hear the bell. Whether it was or was not ringing is a matter of no importance, because, even though it could be heard at the crossing, it was no indication, to a person there, whether the train was coming or going.

It is admitted that the railroad company did not have a flagman stationed at the crossing at the time of the accident. There was no municipal ordinance requiring that precaution at the time. A flagman has been stationed there, day and night, since the accident.

145 LA.—24

It is admitted, too, that there was neither a light nor a lookout on the rear end of the train; and it is proven, and not contradicted, that the street crossing was as dark as Erebus that night.

[1] Our opinion is that it was gross negligence not to have a flagman on the crossing, or a bright light or a lookout on the rear end of the train, under the circumstances.

[2] The argument that plaintiff was guilty of contributory negligence is based upon the fact that he could and would have crossed the track in safety if he had walked faster, or had started as soon as the train had cleared the track, going north. In other words, he stopped, looked, and listened too long. But he did it in good faith and under circumstances in which we think any man of ordinary prudence might have made the same mistake. He had a right to believe, and to act upon the belief, that the railroad company and its train crew would have some regard for the safety of the public. It is true he observed, when the train went forward beyond the crossing and disappeared in the darkness, that there was no flagman at the crossing, nor light nor lookout on the rear of the train. But from these observations he had a right to presume that the train crew had no intention of backing down immediately.

[3] The most difficult task is to determine the amount that would fairly compensate plaintiff for the injuries he suffered. The physician who attended him immediately after the accident, and under whose treatment he remained two months, testified that his most serious injury was a fracture or dislocation of the fifth rib on the left side. The break was in the cartilage where the rib joins the breast bone, and it is said to have been an unusual injury, and one that caused more severe pain and required a longer time to knit then does an ordinary fracture, because of the tendency of the end of the dislocated rib to slip out of place. An

osteopath, who examined plaintiff 40 days after the accident and thereafter treated his ailments, testified, from a record made at the time of his examination and discoveries, that he had found a painful shoulder; sore and suffering and painful tips of the ninth and tenth ribs; trouble in the ninth, tenth, eleventh, and twelfth lumbar vertebræ; pain in left side of abdomen; slight inflammation of the articular surfaces of some of the joints of the feet and ankles; and some sprained tendons of the left leg and feet— the left side being more affected than the right. All of which, we take it, seems more serious to us laymen than it really is. The regular physician of the railroad company called upon plaintiff four days after the accident and found him in bed, complaining of pain in his side. The doctor testified that he had the man remove his pajamas and examined him, and found no contusion or other external injury. Asked whether he was positive that the man had not a broken rib, the doctor replied: "I am morally certain of it." Which we take to mean that the doctor was not quite positive, not having made as thorough an examination as had plaintiff's family physician or the osteopath. An expert in orthopedic surgery, summoned by defendant during the trial, two years after the accident, examined plaintiff in one of the rooms of the courthouse, in company with a local physician called by defendant; and the two doctors testified that they found nothing abnormal about plaintiff's spine or back, or other external evidence of violent injury. According to their testimony, the only remaining evidences of injury, at the time of the trial, were his complaints of pain in the left shoulder when moved conjunctively from the right shoulder, tenderness over the lumbar region and below it, and pain over the ribs where they join the sternum, mainly over the left side of the sternum.

Our conclusion from all of the expert testimony is that plaintiff was very much improved and had almost completely recovered from his injuries at the time of the trial. No doubt his ailments seemed more serious to him than to the doctors, because he alone suffered the physical pain; but the evidence does not show that he is a malingerer. The proof is that he was an experienced and competent machinist, and that his wage-earning capacity has been reduced at least one-half by the accident. He was capable of doing any expert work in the machine shop before the accident, at wages that would range from $5 to $7.50 a day, but has been able to do only very light work, at $2.50 a day, since the accident. He is of middle age, with a family to support, and was out of employment longer than a year, in consequence of the accident. We have concluded to fix the amount of compensation at $3,000. Plaintiff prayed for interest only from the date of the judgment.

The judgment appealed from is annulled, and it is now ordered, adjudged, and decreed that plaintiff, George Osmond Maher, recover of and from the defendant, Louisiana Railway & Navigation Company $3,000, with interest at 5 per cent. per annum from the date of this judgment, and the costs of this suit.

MONROE, C. J., dissents.