LAND, J.
 

 Plaintiff obtained a judgment for $1,891.86 against the Director General of Railroads as the amount of damages resulting to his automobile from a collision with a train of the Texas & Pacific Railway Company, operated at the time under federal control.
 

 The accident occurred at a railroad crossing of said company on Texas avenue in the city of Shreveport, one of the principal thoroughfares of said city.
 

 It was at night, between the hours of 10 and 11 o’clock, was raining, and the avenue leading to the crossing was slippery and dangerous to automobile traffic.
 

 Although the railroad company was required, by city ordinance, to operate continuously its safety gates installed at the Texas avenue crossing, a watchman was not maintained at said crossing between 6 p. m. and 7 a. m., and was absent at the time of the accident; the gates being left open and unguarded.
 

 A city ordinance requiring the railroad company to maintain good and adequate lights at said crossing had also been ignored, and the crossing left in darkness, although the view of trains approaching from the south was obstructed by a hedge fence and the tower at the gates.
 

 The train was “dead equipment” and consisted of an engine, empty baggage car and two coaches, which were being backed in over the crossing to the roundhouse from the Union Depot in the city of Shreveport.
 

 The “forty nine equipment” was manned by the usual crew of hostler or engineer, hostler’s helper or fireman, and the herder, or foreman, who was in charge of the operation of the train, and whose duty also was to keep a lookout at the crossings.
 

 
 *655
 
 The train crew testified that the coaches were lighted; that the foreman was at his post on the platform of the rear coach, with white and red lanterns displayed, when they pulled out from the Union Depot, on the way to the roundhouse; and that, on the signal of the foreman, made with the monkey tail, the train stopped before entering the Texas avenue crossing, which was obstructed from the view of both engineer and fireman by a string of box cars which had been spotted on a side track.
 

 The foreman states that he flagged the crossing with his 'white light, and, finding-no automobile or other vehicle in sight, returned to the platform of the rear coach, and, looking down Texas avenue, observed an automobile turning a cjirve at a considerable distance away and approaching the crossing rapidly. That he then gave the signal with the tail hose to back up, and, after the train had moved 30 feet over the crossing at a speed of 3 miles per hour, he saw that a collision was inevitable, and applied the emergency brake and stopped the train in 2 or 3 feet, when it was struck by the automobile, which, according to the testimony of the foreman, had traveled a distance of 1,179 feet, while the train was moving only 30 feet! A train of three empty cars! The foreman’s version as to the speed of the train is excelled only by that of the engineer, who fixes the rate of progress over the crossing at not more than 1 mile per hour; while one of the occupants of the automobile states that the speed was from 6 to 10 miles per hour, which is more reasonable and natural, and that the train, after striking the automobile, pushed it 6 or 7 feet.
 

 The machine, with plaintiff’s son driving, and with two companions seated with him on the front seat, approached the crossing at a speed of 15 miles per hour, but slowed down to 13 or 14 miles as the driver saw the train suddenly emerge from the south side of the street into the crossing. The testimony of the foreman is flatly contradicted by all three of plaintiff’s witnesses, as the train did not enter the crossing at all until the occupants of the car had arrived in close proximity to the crossing, and the stopping of the train at the crossing and the flagging of the crossing by the foreman is apparently a pure fabrication. On account of the slippery condition of the street, caused by the rain, the driver of the car realized at once the danger of skidding headlong in front of the train, should he attempt to stop suddenly, and turned instantly to the right, and then veering to left put on brakes. Fortunately, the rear wheels of the auto skidded, throwing the back of the car in front of the oncoming train, and turning the hood of the car away from the tracks, thereby reversing the position of the car. The three occupants of the wrecked car testify that there were no lights burning at the crossing, and that they saw no lights in the train or on the platform of the rear coach. They noticed no watchman, at the crossing, and no one on the back end of the coach. They heard no signals of any kind given as a warning of the approaching train. The foreman’s testimony as to his presence on the rear platform, as the train neared the crossing, is not corroborated by either the engineer or the fireman, as neither could see the crossing or the rear of the last coach, because of the obstruction of the view by the box cars standing on the siding. Both the fireman and engineer admit that signals with the air hose could be given by the foreman from the baggage car, as well as from the rear platform of the last coach.
 

 As no signals were heard, no lights on the rear end of the coach seen, and no lookout observed by the occupants of the car at the time of the accident, the trial judge evidently did not consider the testimony of the train
 
 *657
 
 crew persuasive, but accepted the statements of plaintiff’s three witnesses as reflecting the true facts of the ease.
 

 The driver of the auto testifies that, if the street had been dry, he could have stopped his car at once. It is evident from the rapid gyrations of the ear, when veered to the right and then to the left, that the space between it and the crossing could not have been over 30 feet, as testified to by the driver, who saw the train when it first entered the crossing. Had the space been as much as 60 feet, the collision would not have occurred in all probability.
 

 We therefore have a state of facts which shows an utter disregard of all care and caution upon the part of the employees of the railroad company in attempting to back this train over the crossing at night, without lights or signals, and in total darkness. Not even the precaution of sending the lookout ahead of the train with a lantern was taken. No lights were maintained at the crossing. The safety gates were left open and without a watchman. The approach of the train was obstructed from view, until the danger became imminent to persons or vehicles at or over the tracks.
 

 The requirement of the exercise of the physical senses in darkness and without any note of warning of an approaching train would be unreasonable under the circumstances of the case. Such a holding, under the facts before us, instead of making the railroad company an insurer of the public safety, would exempt it altogether from liability for the grossest kind of negligence.
 

 Such is not the law of this state. It is well settled that:
 

 “Eailroad corporations backing their trains through danger points in the streets of a city must use proper care and take proper precautions to safeguard citizens upon them. If they entirely fail to do this; they assume the risk of injury to individuals, even if the injury received be done to some extent to the latter’s imprudence or forgetfulness. They cannot fail
 

 entirely in their duty, and argue that, had the duty been performed, it would have been in the particular case unavailing. The results should have been put to the test by actual trial made at the time.” Lampkin v. McCormick, 105 La. 418, 29 So. 952, 83 Am. St. Rep. 245; Hamilton v. Steamship Co., 42 La. Ann. 824, 8 So. 586; Maher v. Louisiana Ry. & Nav. Co., 145 La. 733, 82 So. 872.
 

 It is inconceivable that if the bell had been rung, or the whistle of the tail hose had been sounded, before passing over the crossing, or if a red light had been displayed in the rear of the’ coach backing in, the occupants of the car, who were near the crossing, should have failed to see or hear any of these signals. The wind shield had been wiped off, and their view ahead was undimmed by the rain. This is a fact made plain by the testimony of plaintiff’s witnesses. The crossing was approached at a rate of speed of 13 or 14 miles per hour. This was not excessive, and the auto, under ordinary circumstances, would have been under complete control and readily stopped.
 

 The occupants of the ear “had a right to presume that no train would approach without a bright light and a lookout on its forward end.” No signal by bell or whistle was given as a warning of danger, before the crossing was entered. Joliff v. City, 144 La. 60, 80 So. 200.
 

 They were under no obligation to come to a dead stop before crossing the tracks. Unknowingly, they were caught in a death trap on a slippery street. They approached the crossing at a moderate rate of speed, and could have stopped the car instantly under ordinary conditions. Aymond v. Western Union Telegraph Co. et al., 151 La. 184, 91 So. 671; Holstead v. Vicksburg S. & P. Ey. Co., 154 La. 1097, 98 So. 679.
 

 A railroad company cannot be permitted to set a trap for the traveler at an unlighted, unguarded crossing in a populous city, where the view of incoming trains is obstructed, and, after the utter disregard of
 
 *659
 
 all signals, precautions and safety ordinances, plead contributory negligence as a defense. Those in charge of the train, under such circumstances, are the first aware of its approach and of the proximity of the danger, unknown
 
 to
 
 persons and vehicles at or near the crossing in a city. They are therefore in a better position than any one else to avoid accidents by the use of ordinary care.
 

 The moderate speed of a train, approaching a crossing, under such circumstances, does not fulfill in any adequate manner the measure of duty of a railroad company to the public, as, the greater the danger, the greater the care exacted by the law.
 

 The claim for damages in the sum of $1,-891.8G is sustained by the evidence. The car was practically rebuilt.
 

 Judgment affirmed.
 

 THOMPSON, J., concurs in decree.