## SCHUTTE v. L. R. & N. CO.

———

(February 11, 1929. Opinion and Decree.)
(February 25, 1929. Rehearing Refused.)
(March 26, 1929. Decree Supreme Court, Writ of Certiorari and Review Refused.)

———

R. A. Dowling and John E. Jackson, of New Orleans, attorneys for plaintiff, appellee.

E. M. Rightor, of New Orleans, attorney for intervener.

R. E. Milling and R. E. Milling, Jr., of New Orleans, attorneys for defendant, appellant.

JANVIER, J. Jules E. Zebal was killed on July 16, 1925, as a result of a crossing accident in which the automobile which he was driving was struck and demolished by a backing train of the defendant company at the corner of Galvez and Lafayette Streets.

Suit is brought by his widow on her own behalf and as tutrix of her two minor children.

Zebal, just before the accident, had apparently turned from the roadway along the new basin canal, had crossed the canal and had headed into Galvez Street in the direction of Canal Street.

Galvez Street is a neutral ground street and the bridge which Zebal crossed was narrow and was so placed as to be on a continuation in a direct line of the river side of Galvez Street. In other words, had Zebal, after crossing the bridge, continued in a straight line, he would have been on the right side of the roadway of Galvez Street. The evidence shows that that side of the street was impassable and that he therefore turned slightly to his left and crossed over to the other driveway and then proceeded along it towards the crossing from Zebal's left. He, of course, was sitting on the left side of the car and, therefore, on the side from which the train was coming.

The day was misty and damp and it was either raining at the moment of the accident or had been raining a short time prior to it.

The train was backing with the caboose leading the way. Next came the tank car, then the tender, then the locomotive.

The charges of negligence are numerous. In fact, we find it difficult to find any act of defendant's employee, which, according to plaintiff's counsel, was properly done.

It is said that the defendant was negligent in that the train was proceeding backwards; in that it was running too fast, in that the whistle was not blown and the bell was not rung, in that the weeds at and near the crossing obstructed the view, in that no flagman was sent ahead of the train, in that the crew had been drinking gin, in that the crew was composed almost entirely of negroes and in other respects too numerous to recount here.

So far as the alleged speed is concerned the evidence leaves us convinced that it did not exceed nine or ten miles per hour. Experts testify that under the weather conditions existing at the time a stop of within 80 to 100 feet at 8 to 10 miles per hour was a good stop and it is shown that the train in question stopped in 102 feet. As to the fact that there was no flagman at the crossing we find that none was required either by law or by custom and the condition of the street is conclusive proof of the fact that there was not sufficient traffic on the crossing to require one.

It was conclusively shown that such weeds as there were near the crossing were in the neutral ground and that there were none between the automobile and the train.

In fact we do not find in any of plaintiff's charges anything sufficiently founded on fact to warrant discussion unless it be the evidence as to the warning signals.

Four witnesses testified positively that the whistle was not blown and the bell was not rung.

Of these four, one Laurent is obviously entirely unworthy of belief. It is not often, fortunately, that one comes across a witness so violently prejudiced and so totally untruthful.

The character of this man's testimony is well illustrated by the following excerpts from the record.

Tr. page 50:

"Kids get killed almost every other day or so. The crossing is only used for that."

Tr. Page 49:

"Every time we hear a train coming, we run out there to look, expecting to see them hit something."

There is not a word of evidence as to any such accidents at that crossing or anywhere else in that vicinity and the statements are evidently false from beginning to end. They were apparently prompted by his violent hatred of the negro employees of the defendant as is shown by the following statement by Laurent.

"Q. And you very much resent the fact that there is a negro brakeman and a negro fireman on this train, don't you?"
"A. Yes, sir."

Two of the witnesses for plaintiff who say no signals were given were more than a block away. One of them says they were sitting inside a restaurant eating lunch. The other says that they had not yet gotten out of the automobile at the restaurant, but no matter which is correct they were some distance away and there was nothing unusual to call to their attention and to fix in their recollections a train signal. It should be remembered that several tracks were in that immediate vicinity and trains were passing to and fro with great frequency.

The fourth witness was inside a warehouse, alongside the track on which the train had passed and about 200 feet from the crossing.

We are unable to understand why he did not hear the signals, unless his failure to recollect was the result of a familiarity with whistles and signals to such an extent that they could make no lasting impression on him.

As against these four witnesses we have the positive testimony of all the train crew and we have the admission that two or three negroes were on the head-end of the caboose and there is no gainsaying the fact that the "monkey-tail whistle" was there. Why shouldn't they have blown it? It required no effort and not only instinct but the well-known nature of negroes to enjoy harsh sounds and noises would have prompted them to blow it.

But whether it was blown or not and whether the bell was rung or not, we see no escape from the established jurisprudence of this State requiring the use of the senses of sight and hearing.

It is absolutely certain that after the train reached a point within 200 feet from the crossing and the automobile reached a point about 200 feet or more from the crossing each remained in full view of

the other until they both reached the crossing. The testimony is clear on this and the pictures show it conclusively.

One of the witnesses claims to have shouted a warning to Zebal when there was yet time for him to stop his automobile but states that it was not heeded. That someone shouted just before the accident is corroborated by one of plaintiff's witnesses who states that the shout was one of the things that called his attention to the impending collision.

As was said by the Supreme Court of Louisiana in Eyma Brown vs. Railroad Co., 42 La. 355, 7 So. 684, 21 Am. St. Rep. 374:

"When one approaches a point upon the highway, where a railroad track is crossed upon the same level, it is his plain duty to proceed with caution, and if he attempts to cross the track, either on foot or in a vehicle of any description, he must exercise, in so doing, what the law regards as ordinary care under the circumstances. He must assume that there is danger, and act with ordinary prudence and circumspection upon that assumption.

"In attempting to cross, the traveler must listen for signals, notice signs put up as warnings, and look attentively up and down the track.

"Statutes and municipal ordinances in every jurisdiction prescribe specifically the duty of railway corporations in respect to railways crossings; but no failure on the part of the railroad company to do its duty will excuse any one from using the senses of sight and hearing upon approaching a railway crossing, and whenever the due use of either would have enabled the injured person to escape the danger, the injury is conclusive evidence of negligence, without any reference to the railroad's failure to perform its duty."

The measure of the duty of the traveler on the highway when he attempts to cross a railroad track has been definitely fixed by the U. S. Supreme Court in the matter of B. & O. R. R. vs. Goodman, 275 U. S. p. 66, 48 S. Ct. 24, 72 L. Ed. 167, 56 A. L. R. 645; in which the Court said:

"Goodman was driving an automobile truck in an easterly direction and was killed by a train running southwesterly across the road at a rate of not less than sixty miles an hour. The line was straight, but it is said by the respondent that Goodman 'had no practical view' beyond a section house two hundred forty-three feet north of the crossing, until he was about twenty feet from the first rail, or, as the respondent argues, twelve feet from danger, and that then the engine was still obscured by the section house. He had been driving at the rate of ten or twelve miles an hour, but had cut down his rate to five or six miles at about forty feet from the crossing. It is thought that there was an emergency in which, so far as appears, Goodman did all that he could.

"We do not go into further details as to Goodman's precise situation beyond mentioning that it was daylight and that he was familiar with the crossing, for it appears to us plain that nothing is suggested by the evidence to relieve Goodman from responsibility for his own death. When a man goes upon a railroad track he knows that he goes to a place where he will be killed if a train comes upon him before he is clear of the track. He knows that he must stop for the train, not the train stop for him. In such circumstances it seems to us that if a driver cannot be sure otherwise whether a train is dangerously near he must stop and get out of his vehicle, although obviously he will not often be required to do more than to stop and look. It seems to us that if he relies upon not hearing the train or any signal and takes no further precaution he does so at his own risk. If at the last moment Goodman found himself in an emergency, it was his own fault that he did not reduce his speed earlier, or come to a stop."

Of what use to cite innumerable other cases. They are all to the same effect. All require the traveler on the highway to look and to listen and all hold that failure to do so will prevent recovery unless, on account of some unusual obstruction, looking or listening would not have prevented the collision, or unless, the railroad has, by the erection of gates or the

placing of a flagman, lulled the traveler into a false sense of security.

Such was not the case here. Zebal was familiar with the locality. He had travelled that neighborhood for years and the slightest care on his part would have prevented the accident. Either he did not look at all or if he did look he tried to beat the train. In either case it was his negligence that was the proximate cause of the accident.

It is therefore ordered, adjudged and decreed that the judgment appealed from be and it is annulled, avoided and reversed and that there now be judgment dismissing this suit at the cost of appellant.

WESTERFIELD, J., dissenting. I believe the case of Draiss vs. Payne, 158 La. 652, 104 So. 487, applicable, and controlling here. I therefore respectfully dissent.