## No. 616

### First Circuit

---

## DARDENNE ET AL. v. TEXAS & PACIFIC RAILWAY CO.

---

(April 14, 1930. Opinion and Decree.)

---

Schwing, Morrison, Schwing & Obier, of Plaquemine, attorneys for plaintiff, appellant.

Gilbert & Gianelloni, of Napoleonville, attorneys for defendant, appellee.

MOUTON, J. While Mr. Edward Douglas Leche was driving a Ford car over the tracks of defendant company in June, 1929, about 10:30 in the morning, he was run over and killed by a train of defendant company. His heirs are suing defendant for $10,000 in damages, comprised of various items specified in the petition. The demand was rejected. Plaintiffs appeal.

The district judge based his conclusions on his appreciation of the substantial facts of the case, and says:

"I am strongly inclined to the opinion that at the time of the collision, defendant's train was moving at a speed in excess of the limit fixed by the town ordinance and it was certainly negligent on the part of defendant's locomotive engineer to look back and speak to the fireman (as he admits that he did) when the train was approaching the Labauve street crossing. I think there is some doubt as to whether the wig-wag signal was working at the time when the excursion train approached the crossing. It seems that this mechanical device was occasionally out of order, and I am satisfied from the evidence that it was not working at 6:25 A. M. on the day when the collision occurred, and that it did not work when a train passed at some time in the afternoon of the same day."

From the foregoing estimate of the evidence, it is apparent that the trial judge found that the defendant company was at fault, and so do we find.

The defendant company pleads contributory negligence on the part of the deceased, and this presents the vital issue in the case.

It is necessary, in order that we may arrive at a proper solution of that question, to refer to the physical conditions which existed near the railroad crossing where the accident happened, and to Labauve street, over which Mr. Leche was traveling before reaching that crossing.

The record shows that Labauve street runs east and west through the town of Plaquemine; the railroad tracks, four in number and adjoining each other, north and south; that the track on which Mr. Leche was struck was the one east of the others, and towards which he was driving. It also appears that a street 23 feet wide, known as Railroad avenue, runs north and south, east of, adjacent to, and parallel with these tracks of defendant company. This Railroad avenue intersects La-bauve street east of the crossing, and runs north and south, both ways, beyond the crossing. It also appears from the photographer's pictures in the record that there are some trees and a board fence near and at the corner where Labauve street intersects Railroad avenue.

Mr. Mollaison, a disinterested witness so far as the record discloses, saw the accident from his front porch, where he was sitting on that morning. He says Mr. Leche was traveling westward on Labauve street in the direction of the crossing, and was going at about 12 or 15 miles an hour; that as he got to the stop signal, he slowed up, then speeded up the incline up the tracks, and, as the four wheels of his car had gotten on the track, he was struck. He says he slowed up but never stopped. Mr. Mollaison says, however, that, before Mr. Leche speeded up the incline, he looked to his left and continued to look in that direction until the collision occurred.

Mr. Boudreaux, another witness apparently equally disinterested, also saw the collision. Mr. Boudreaux also says that Mr. Leche did not stop his car, and drove up on the crossing where the train "picked him up," as he described it. This witness however, says that it seemed to him that Mr. Leche "didn't look either way, left or right," and proceeded up on the crossing. In that respect this witness differs with Mr. Mollaison, who testified that Mr. Leche had looked to his left in the direction the train was coming, but they both say that he did not stop.

Mr. Boudreaux was sitting on a gallery nearby, and so was Mr. Mollaison, who was on his porch. Both say they had a clear view, and the proof is that the day was clear and bright. The testimony of these witnesses is not contradicted, and

it must therefore be accepted as a fact that Mr. Leche never stopped his car when he got to the stop signal, and, according to Mr. Mollaison, speeded up to the incline of the crossing, and, according to both, drove up on the track without stopping.

The proof is clear that at that time the train was coming from New Orleans, the south, was moving towards the crossing, and it is not possible that the deceased looked to his left, continued to look in that direction, as is stated by Mr. Mollaison, and that, while actually looking that way, drove up in the pathway of the advancing train. We say that because, as he emerged from the stop signal, he had a clear view on his left along Railroad avenue southward, the direction from which the train was coming. We say he had a clear view as he entered the avenue, because there were certainly no obstructions across or along that avenue to obscure his vision southward, or, for that matter, northward. In order to accept the proof that he had looked, and continued to look, to his left, we would have to hold that Mr. Leche went deliberately to his death, of which there is nothing whatsoever to suggest, or that his eyesight was bad or defective, of which there is absolutely no evidence.

Mr. Mollaison simply made an error in that respect, and the real fact is that, as was said by Mr. Boudreaux, he did not look either to his left or to his right as he proceeded across Railroad avenue to the railroad tracks.

In controverting the proposition that a person driving a car must actually stop upon approaching a railroad track, counsel for defendant refers to Aymond vs. Western Union Telegraph Co., 151 La. 184, 91 So. 671, where the court held he was not required in such a case, to come at once to a position of absolute immobility. This decision was rendered prior to the enactment of Act No. 12 of 1924, which says, that the driver of such a vehicle shall not go upon a railroad track before stopping at a distance of not less than 10 feet nor more than 50 feet from the nearest track, and "looking for trains," etc.

There are later cases quoted by counsel, and one in Draiss vs. Payne, 158 La. 652, 104 So. 487, which apparently have held to that doctrine, the latter case not specifically referring to it. Counsel for plaintiff refers also to that part of Act No. 12 of 1924, above cited, which says, that its provisions shall not apply where crossings are provided with flagman, and signal to proceed has been given by the flagman, or where gates are provided and the gates are open.

His reasoning is, if we correctly appreciate it, that, as in this case, the wig-wag signal was not working or operating, that this condition thus existing was equivalent to an invitation to Mr. Leche to proceed across the railroad tracks. He cites several authorities from other jurisdictions where the courts have held, under circumstances somewhat similar, that open gates at crossings or such like are tantamount to an invitation of that character to autoists or travelers in motor vehicles. We do not believe that because of the failure of a wig-wag to operate it could be held as an invitation to a traveler in car or auto to venture across a railroad crossing, particularly under the provisions of our statute, which do not mention such a mechanical device in the proviso where it refers to the flagman and the "gates that are open."

It will be noted, however, that, in Canadian Pac. Ry. Co. vs. Slayton (C. C. A.) 29 F. (2d) 687, 689, cited by counsel for plaintiff in support of that contention, after the statement by the court implying an invitation to the driver where the crossing has open gates, it proceeds to say: "He still has a duty of doing what a prudent man would do under like circumstances." In connection with the foregoing quotation, it may not be amiss to refer to Act No. 12 of 1924, which, after stating that the driver of motor vehicle shall stop not nearer than 10 feet and not more than 50 feet from the nearest track, says, "And looking for trains." Let us say, for the sake of argument, that the driver is not required to come to a position of absolute immobility on approaching a crossing, he is certainly required to look and listen, when such looking and listening shall be effective, before he proceeds to negotiate a crossing.

The words "and looking for trains" in the Act of 1924, and the very decision in 29 Federal, above cited, where it is said that the automobilist has still the duty of proceeding with prudence, support our above statement that he must not fail to observe the indispensable requirement of "looking and listening." There is no law, statute, or decision of which we are aware that excuses or relieves an autoist from the observance of these requirements before attempting to go over a railroad crossing. In this case, it is manifest that Mr. Leche failed to look to his left as he entered Railroad avenue or thereafter when he was going across the avenue. If he had, it is incontrovertible that he would have seen the train coming from the south, and would have had ample time to stop his car before reaching the crossing, or to have turned to his right or left in the avenue. Obviously, his mind was absorbed or fascinated by some subject or other, or for some unaccountable reason he was oblivious to his surroundings, drove in front of the train, and, by his inattention, carelessness, or negligence, contributed to the accident.

Counsel for plaintiff made an effort to show that the railroad whistle had not been blown nor the bell rung, as the train approached the crossing. The engineer on the train, the fireman, and the conductor testified otherwise, and Mr. Boudreaux, who was sitting on his gallery not far from the crossing, confirms their testimony in this respect. The fact is that Mr. Leche was partially deaf, and very probably did not hear the blasts from the railroad whistle or the sound of the bell. If he had had good hearing, it is possible his attention would have been called to the impending danger, and that his life would have been spared, but it seems it had to be otherwise. The fact that he suffered with this infirmity also demanded that he should have exercised more care in making the crossing than would have been required of persons with normal hearing.

Counsel also endeavored to prove that the train was going at 30 or 35 miles an hour at the time of the collision.

It is true that the cowcatcher carried the body of the unfortunate victim a block and a half from the point of contact before the train was stopped, and, that under ordinary circumstances it could have been brought to a standstill in a shorter distance. It is true also that the engineer says, upon striking the auto Mr. Leche was driving, he immediately applied the emergency brakes. He does not seem able to account why he glided along to the distance stated before stopping. It should be observed that, in such desperate and

sudden emergencies, certain results will follow that are not easily accounted for. True it is also that some witnesses estimated that the train was then moving at 30 or 35 miles an hour; such estimates are deceiving, and cannot, as a general proposition, be taken as accurate.

The crew in charge of the train testified it was going at 10 or 12 miles an hour. It is shown that the tracks were undergoing repair on the way to the crossing in the direction the train was coming, and near the crossing.

John Ritter, the fireman, testified that the track was being skeletonized at the time. His explanation of this skeletonization is that all the ballast had been taken from around the ties, and that the rails were sitting on these naked ties. That statement stands uncontradicted. He explains, as it must no doubt have been the case, that the greatest caution must be exercised in running a train over rails in that condition.

Wilson, the engineer, says he was going between 10 and 12 miles an hour, because there was speed restriction over this skeletonized piece of the road. There is, in our opinion, every likelihood that he observed that restriction, if not in obedience to the requirements of the company, at least for his own safety, that of his crew, and the passengers on the train. We find that, though the train was moving at a speed exceeding 12 miles an hour fixed by the town ordinance, and as found below, we do not think that it was going at 30 or 35 miles, or at a reckless speed, when the collision occurred. The defendant company was at fault, as we have before stated, but the deceased clearly contributed to the accident by his carelessness or culpable negligence, and his heirs, the plaintiffs, were correctly denied recovery. Woods vs. Jones, Cowan & Knowlton, 34 La. Ann. 1086; Sibley vs. New Orleans City & L. R. Co., 49 La. Ann. 589, 21 So. 850; Gibbens vs. New Orleans Terminal Co., 159 La. 353, 105 So. 367; Perrin vs. New Orleans Terminal Co., 140 La. 818, 74 So. 160; Nolan vs. Illinois Cent. R. Co., 145 La. 483, 82 So. 590; Ladner vs. New Orleans Terminal Co., 139 La. 262, 71 So. 503.