### PEARCE v. MISSOURI PAC. R. CO.
#### No. 1005.

Court of Appeal of Louisiana. First Circuit.

Oct. 5, 1932.

Hawkins & Pickrel, of Lake Charles, for appellant.

Pujo, Bell & Hardin, of Lake Charles, and Henry Bernstein, of Monroe, for appellee.

LE BLANC, J.

This is a suit for damages for personal injuries alleged to have been sustained by the plaintiff as a result of a collision between an automobile which he was driving and the lead car of a freight train of the defendant railroad company, which was being backed across a street crossing in the city of Lake Charles, on the night of November 8, 1930. Plaintiff was driving north on Kirkman street, which runs north and south, and the train, consisting of an engine and tender, with a string of nine box cars, was traveling west. The accident occurred at about 9 o'clock at night, and it is shown that at the time it was dark and somewhat misty.

From the testimony, it appears that the crossing is in a rather populous section of the city and is traversed quite extensively by vehicular traffic. The grade from the street level to the tracks is shown to be two feet. The city having a population of over 10,000 inhabitants, the provisions of Act No. 12 of 1924 requiring railroads to erect and maintain a "Louisiana Law Stop" signboard at grade crossings, do not apply. There was no flagman stationed at the crossing, nor were there any light or other signal. Two of the trainmen were stationed on top of the lead car, about the center thereof, each with a signal lantern. Because of the height of the box car on which they stood, it is doubtful that these signal lights could be easily perceived by the driver of an automobile approaching the crossing. One of these men, as well as the fireman and engineer aboard the train, all testify that the bell was ringing and that the whistle was being blown as the train neared the crossing, all in accordance with the rules of the railroad company and as usual in such cases. Whatever those signals, as appear from the record, amounted to, it would seem to us, because of the fact that the train was backing and naturally the engine from which they emanated was farthest away from the crossing, that they were too far to be effective to serve as a warning to automobile traffic in the street. Especially would we think so on a misty night when it is reasonable to believe that people riding in automobiles have their cars closed. On this branch of the case, therefore, involving the negligence of the defendant railroad company, we find ourselves in accord with the finding of the trial judge, who held that, at a street crossing of the nature such as the one here described, the operation of the train did not meet the test of ordinary care.

The learned district judge, however, sustained a plea of contributory negligence urged against the plaintiff, and rejected his demand for damages. That plea forms the important issue on appeal.

It may be stated, as a primary consideration in cases of this kind, that a railroad grade crossing is dangerous, and it must be recognized that trains enjoy a right of way over their own rails at those places the same as they do over any part of their tracks. Any person, whether on foot, in automobile, or other kind of vehicle, venturing over such crossing, is held to the exercise of due care. That care involves the duty, so familiar in the jurisprudence of this country as to have become almost commonplace, "To Stop, Look and Listen." He must not rely altogether on the idea that the railroad will observe all of the usual safeguards for his protection, nor must he depend entirely on his sense of hearing. "If he relies upon not hearing the train or any signal and takes no further precaution he does so at his own risk." So said Justice Holmes in Baltimore & Ohio R. Co. v. Dora Goodman, 275 U. S. 66, 48 S. Ct. 24, 25, 72 L. Ed. 167, 56 A. L. R. 645. Because of its very frequent citation by the various courts throughout the country, that case may be said to have established a new landmark in the jurisprudence dealing with railroad crossing cases. The duty of care on the part of a person approaching a crossing is so clearly pointed out that we think it is pertinent for us to quote further: "When a man goes upon a railroad track he knows that he goes to a place where he will be killed if a train comes upon him before he is clear of the track. He knows that he must stop for the train not train stop for him. In such circumstances it seems to us that if a driver cannot be sure

otherwise whether a train is dangerously near he must stop and get out of his vehicle, although obviously he will not often be required to do more than to stop and look. * * * If at the last moment Goodman found himself in an emergency it was his own fault that he did not reduce his speed earlier or come to a stop. It is true as said in Flannelly v. Delaware & Hudson Co., 225 U. S. 597, 603, 32 S. Ct. 783, 56 L. Ed. 1221, 44 L. R. A. (N. S.) 154, that the question of due care very generally is left to the jury. But we are dealing with a standard of conduct, and when the standard is clear it should be laid down once for all by the Courts. See Southern Pacific Co. v. Berkshire, 254 U. S. 415, 417, 419, 41 S. Ct. 162, 65 L. Ed. 335."

With these considerations in mind, let us examine the conduct of the plaintiff in this case just before and at the time he approached the crossing where he was injured.

The evidence shows that he had been hunting with a friend during the afternoon. That friend had been accidentally shot in the arm, and it was necessary for plaintiff to take him to a sanitarium. Not wanting to unduly excite his friend's wife by calling her over telephone, he decided that he would go for her in his car and take her to the sanitarium. He discovered, however, that he had blood on his clothes, and thought that it would not do for her to see him in that condition when he broke the news to her. He therefore went to his home to change clothes. On getting back to his car, he thought of the seat being full of blood, and again went to his house to get a cloth to wipe the seat off. We think it is reasonable to say that under such circumstances he was under a considerable nervous strain. He finally got started, and says that, as he approached the crossing, he was going probably thirty-five miles per hour. He looked both ways and slowed down, as he always did because of the fact that it was a very rough crossing. He was familiar with it, as he crossed there half a dozen times a day. "As I say," he continues, "I slowed down in about one hundred feet of the track, to anywhere from five to seven miles, as I always do. * * * I entered the crossing very slow. There was no warning, no whistles or bells, anything of the kind. I was struck. I don't know to this day what hit me."

It is evident therefore, from the plaintiff's own testimony, that, while he looked both ways and slowed down in his rate of speed, he did not stop, and neither does he appear to have been listening. His conduct therefore did not meet the standard laid down by Justice Holmes in the Goodman Case cited supra.

It may be urged, however, that in this state there are some decisions which would indicate that our courts have not gone to the extent of requiring a person to come to a state of absolute immobility, on reaching a railroad crossing, and in this connection, reference may be made to the cases of Aymond v. Western Union Telegraph Co. et al., 151 La. 184, 91 So. 671, Holstead v. Vicksburg, S. & P. R. Co., 154 La. 1097, 98 So. 679, 680, and Draiss v. Payne, Agent, 158 La. 652, 104 So. 487. In all three of these cases, however, the condition of and at the respective crossings was of such nature as to warrant the court in making use of the word "trap" in describing each. Moreover, in the Draiss Case, there was an utter disregard of the provisions of a city ordinance requiring safety gates; and in the Aymond Case the court seems to have stressed the fact that the plaintiff was a boy not yet 14 years of age. In the Holstead Case it appears that a freight depot obscured the view of the train which was backing over the crossing, and the court does hold the persons approaching it to proceed cautiously until a view may be had. "However," the decision reads on, "he cannot be blamed for being caught in what the trial court finds in this case to have been a trap set by the defendant, merely because he does not come to a dead stop." We note in this case that one of the justices was recused and two others dissented. In the case of Gibbens v. New Orleans Terminal Co., 159 La. 347, 105 So. 367, 369, the Supreme Court, in commenting on the Aymond Case, says: "It was not intended, and the court did not hold * * * that a party before crossing a railroad track was not required to look and listen. What the court did say was that the obligation to stop must not be accepted so literally as to require a person upon approaching a railroad track to come at once to a position of absolute immobility."

The decision in the Gibbens Case holds very plainly, that "The jurisprudence of this state is uniform to the effect that a pedestrian or a driver of a vehicle upon approaching railroad tracks and public railway crossings must, at his peril, stop, look, and listen before proceeding on the track or to make the crossing, and if he does not do so he is guilty of contributing to any injury which he may suffer, and cannot recover therefor."

A number of its decisions are cited by the court, which, to add here, would only be unnecessary repetition.

█ We are persuaded, from a careful consideration of the record in this case, that the plaintiff, because of the happening in the few hours preceding the accident in which he was injured, was under a rather severe strain, and, in his anxiety to bring his friend's wife to the latter's bedside at the sanitarium, was not as prudent and careful as he normally might be; that he ventured across the railroad track without listening, without looking effectively, and certainly without stopping. His failure especially to stop was undoubted-

ly the proximate cause of his injury. It amounted to contributory negligence on his part, and bars his recovery.

The judgment of the lower court correctly rejected his demand, and it is affirmed.