MILLER, Judge.
Defendant Missouri Pacific Railroad Company appeals the trial court’s factual determination that its train was making an unsignaled backing maneuver with four locomotives pushing nineteen unlighted freight and tank cars across an unlighted and unprotected street crossing. Defendant contends that its employees were not negligent and alternatively that the driver of the westbound pickup truck and his guest passengers were contributorily negligent. We affirm, but reduce the $40,500.-00 award.
The accident occurred in Kinder after dark on December 8, 1969 while a drizzling rain was falling or shortly after the drizzle had stopped. The train was maneuvering to pick up three freight cars. While the locomotives were backing eastward, the rear cars were backing in a northerly direction toward Alexandria on the mainline track.
The westbound pickup truck in which Manuel was riding was proceeding west on Avenue C. The door on the driver’s side of the pickup truck was struck by the coupling device on the north end of the tank car. The truck was pushed 60 feet northward until it struck and severely damaged the switching device at that point. The train continued north some distance.
The mainline was the westernmost of three sets of north-south tracks which crossed Avenue C. This paved street takes vehicular traffic due east and west in Kinder. All three north-south rail tracks at this intersection proceed in the approximate direction of 15 degrees and 195 degrees.
The backing locomotives were approximately one-quarter mile from the lead car *378 (in the backing maneuver) and no effort was made to sound a bell or horn. The lead car was an unlighted black tank car loaded with a dangerous substance. Tr. 193. The railroad rules prohibited the brakeman from burning a fuse near this tank car. Tr. 226, 237.
Defendant contended that the brakeman riding the west side of the north end of the black tank car aimed his spotlight at the approaching westbound pickup truck to warn the driver; that when the brakeman determined that this warning had no effect, the brakeman jumped down (a distance of four feet) from the (four to five mile per hour) moving train when it was four to five feet from the intersection; that he then ran to the intersection to protect the crossing and was aiming his spotlight toward the approaching westbound pickup truck; that during this time he aimed his spotlight to signal a slowdown to the train crew; that before impact, he signaled to the engineer and head brakeman an emergency stop. Mr. Leonard Whirls, the brakeman, and an independent eyewitness Mr. Roosevelt Taplin so testified.
The trial court rejected the testimony of Messrs. Whirls and Taplin and accepted instead the testimony of the locomotive engineer Mr. Jack R. Watts and the head brakeman Mr. C. B. Howard. Both denied that Whirls gave a preliminary slowdown signal which Whirls adamantly insisted that he properly transmitted. Both saw Whirls’ signal lantern prior to the accident and state unequivocally and on numerous occasions that the only signal given by Whirls was the emergency stop signal. Whirls testified that his lantern was switched to operate as a spotlight (rather than as a floodlight). It would be impossible for his spotlight to be effectively signaling the westbound pickup truck at the same time his spotlight was observed by the engineer and head brakeman.
The physical facts establish that the emergency stop signal was transmitted after impact. The crew testified that the train made a good stop and that with its speed and configuration this would permit a stop within 20 to 40 feet from the giving of the signal. The train pushed the pickup truck 60 feet after impact and continued some distance beyond that point.
The investigating city policeman asked Mr. Whirls after the accident “. . .if he ever signaled or flagged” the approaching westbound pickup truck. Whirls answered “No, sir.” Tr. 62, 63.
The three occupants of the westbound pickup truck testified that they noticed a stopped vehicle on the far side of the tracks. They all testified that they stopped before reaching the tracks and the trial court specifically accepted this testimony. The windshield wipers were operating. It appeared to guest passenger Mr. Lejeune that the (Taplin) vehicle which had stopped on the far side of the tracks was backing up to turn around to proceed in the opposite direction on U.S. 165.
Both Fuselier and Manuel testified that they looked in both directions and seeing nothing approaching, drove slowly across the railroad tracks. They had crossed two sets of tracks and were half way across the third set of tracks when the north end of the slow moving train struck the driver’s side of the pickup truck.
The 62 year old brakeman Mr. Leonard Whirls was suspended from his employment for 90 days following this accident. His testimony and that of Mr. Taplin recited an utterly impossible series of events. It would be difficult to accept their testimony if supported by others. The denial of their version by such impressive witnesses as the locomotive engineer and the head brakeman, makes rejection of Whirls’ and Taplin’s testimony manifestly correct.
We find that defendant’s employees were backing four locomotives and nineteen unlighted freight and tank cars at a speed of four to five miles per hour across an unlighted and unprotected paved street crossing without sounding or signaling a warning.
*379 A backing train is considerably more dangerous than one proceeding in a forward direction. Stelly v. Texas & N. O. R. Co., 49 So.2d 640, 644 (La.App. 1 Cir. 1950). See also Dobrowolski v. Holloway Gravel Co., Inc., 173 So. 474, 476 (La.App. 1 Cir. 1937). It is only logical that the safety precautions taken by the railroad in such situations should be at least as effective as those taken when a train is proceeding in a forward direction.
LSA-R.S. 45:561 requires locomotives to have and use bells and whistles at crossings. This statute is to add a factor of safety (sound) to the factor of sight already present when a locomotive and its headlight approaches a crossing. However, when a train backs across a crossing at night, especially where the length of the train is significant, the factors of sight and sound emanating from the locomotive are of no benefit to an approaching motorist. It was well stated in Dobrowolski:
“A light on the locomotive over 600 feet away, if there were such a light, was not sufficient, as such a light would not enable a motorist on the highway to see a train of unlighted cars more or less noiselessly, even stealthily, creeping up from out (of) the darkness onto the highway. Nor would the blowing of the whistle and the ringing of the bell on the locomotive that distance from the crossing be sufficient warning . . .” (Emphasis and parenthetical notation added.) 173 So. 474, at 476.
Some precaution must be taken which would be as effective as those available had the locomotive preceded instead of pushed the other cars across the crossing.
The lead car here was a black tank car which moved at an imperceptible and noiseless speed. The lone brakeman was perched on the west side of this car (away from the- approaching vehicle) and had his lantern switched to spot rather than flood which drastically limited the telltale glow except to the aimed direction. The brakeman and his light were hidden from the approaching vehicle and thereby offered no notice that the train was approaching.
The brakeman’s duties were first to signal the engineer in relation to the coupling operation then underway and secondly to signal traffic — the former being his primary duty.
In Polizzi v. Louisiana Ry. & Nav. Co., 14 La.App. 442, 131 So. 611, 613 (La. App. Oris. 1930) the court stated:
“The flagman at a street crossing must station himself in such a position as to give proper and adequate warning to those who are about to cross the tracks of the approach of a train.”
This rule applies where the brakeman rides the lead car across the crossing. Pearce v. Missouri Pac. R. Co., 143 So. 547 (La.App. 1 Cir. 1932); Kraemer v. Louisville & N. R. Co, 144 La. 57, 80 So. 198 (1918).
It is gross negligence to back a string of cars at night over a public crossing without lights or proper warning signals. Dobrowolski v. Holloway Gravel Co., Inc., 173 So. 474 (La.App. 1 Cir. 1937). A hidden light is tantamount to no light at all and since the brakeman’s hidden lantern was the only safety measure employed by the railroad, defendant is found guilty of gross negligence.
There was no negligence on the part of Mr. Fuselier, the driver of the westbound pickup truck. The record shows that he came to a complete stop at a point ten feet from the edge of the first of the three sets of tracks. At this time Fuselier and Manuel both looked to the right and left. Seeing nothing, Fuselier proceeded at four to five miles per hour to' cross the three sets of tracks. He was not required to stop at every set of tracks. Cherry v. Louisiana & Arkansas Ry. Co, 121 La. 471, 46 So. 596 (1908). It is true that the windows of the truck were up but the train offered no bells or whistles or other sound oriented safety precautions.
*380 It is well known that a freight car can be backed out into the road with little noise and its movements are almost imperceptible unless there are some lights or signals to indicate its approach. Dobrowolski, 173 So. 474 at 477. The closed windows did not contribute to the accident.
The occupants of the truck were entitled to presume that no train would be silently and stealthily eased out of the darkness into the side of their slow moving vehicle. Instead they were entitled to notice by sound and sight. Neither was provided. Under these circumstances they could expect a flagman provided with a bright light whose primary if not exclusive duty it was to warn traffic of the approaching train. Draiss v. Payne, 158 La. 652, 104 So. 487 (1925); Dobrowolski, supra.
Since both vehicles were approaching the point of impact at four to five miles per hour and since the pickup truck was half way across the track before the coupling device of the train (which protrudes some distance in front of the tank car) struck the side of the truck, the train and pickup truck were at a 45 degree angle during the approach to impact. There is no evidence to suggest that the pickup truck's headlights should have been aimed 45 degrees to its left. Backing trains do not normally lend themselves to observations via a motorist’s headlights. Dobrowolski, supra.
When the truck was stopped close to the tracks and the occupants therein failed to discern the stealthily moving black tank car because of the lack of or inadequacy of warning devices, the driver was reasonable in assuming that it was safe to proceed.
QUANTUM
The trial court awarded Leroy K. Manuel, Individually, the sum of $1,926.42 with interest, as medical expenses, and as Administrator, the sum of $40,550.00. Maryland Casualty Company, intervenor compensation insurer, was granted a right of reimbursement for Leroy K. Manuel for all medical expenses and the $39 weekly compensation previously paid. We affirm in-tervenor’s right of reimbursement, increase the award for medical expenses and reduce the awards made on Terry Manuel’s behalf.
At the time of the December 8, 1969 accident, Terry Manuel was earning $50 a week as helper in the installation of air conditioning and heating units. Terry was 16 and had dropped out of school because he was unable to do school work. He had worked for about two months at the time of this accident. Terry was unable to return to hard manual labor for six months. At the end of this time, though unable to do heavy lifting or strenuous manual labor, he assisted his father in plumbing and electrical work which, if not done for his father, would pay him a salary at least equivalent to that received prior to the accident. We award $1200 as loss of past earnings.
Terry was first seen by Dr. Norman Paul Morin, an orthopedic surgeon on December 8, 1969 at Memorial Hospital in Lake Charles. He was admitted to the hospital and treated for injuries to his left foot—a compound comminuted fracture of the large toe, a compound fracture of the second and third toes and extensive larcer-ations about the foot. He was released on December 18, 1969. During and shortly after this hospitalization, Terry was treated for “severe pain” with morphine. He was given a maximum dose for three days and a reduced dosage for seven to ten days. On January 22, 1970 Terry was readmitted to the hospital and the third toe on his left foot was amputated. He was released on January 27, 1970. Subsequent to these treatments, he was seen as an outpatient three times—Feb. 21, March 13 and April 24, 1970. He has not been seen by a physician since his April 1970 treatment.
Dr. Morin estimated that Terry has a 25% disability of the left foot and stated that there is a substantial probability that a *381 toe prosthesis of the second toe will have to be performed in the future. Medical bills to date amount to $1,926.42. We award $2,626.42 for past and future medical expenses and $17,000 for pain, suffering and disability.
The judgment is amended to increase the award to plaintiff Leroy K. Manuel, Individually, and against Missouri Pacific Railroad Company to the sum of $2,626.42 together with legal interest from judicial demand.
The trial court judgment is amended to reduce the award to plaintiff Leroy K. Manuel, as Administrator of the Estate of his minor son, Terry Manuel, and against Missouri Pacific Railroad Company to the sum of Eighteen Thousand Two Hundred ($18,200.00) Dollars together with legal interest from judicial demand.
The remainder of the judgment is affirmed. Costs of this appeal are assessed to defendant appellant.
Amended and affirmed.